**US WEST, INC.; US West Communications, Inc.; US West Multimedia Communications, Inc.; Washington Independent Telephone Association; and Pacific Telecom, Inc., Plaintiffs,**

v.

**UNITED STATES of America; Federal Communications Commission; and Janet Reno, in her official capacity as Attorney General of the United States of America, Defendants.**

No. C93–1523R.

United States District Court,
W.D. Washington,
at Seattle.

June 15, 1994.

---

David J. Burman, Perkins Coie, Peter D. Byrnes, Byrnes & Keller, Seattle, WA, Louis R. Cohen, Steven M. Dunne, Ken Ferree, Wilmer, Cutler & Pickering, Washington, DC, for US West, plaintiff.

Robert Maxwell Taylor, U.S. Attorney's Office, Seattle, WA, Theodore Hirt, U.S. Dept. of Justice, Tax Div., Washington, DC, John R. Tyler, U.S. Dept. of Justice, Civil Div., Washington, DC, for defendants.

Keith Allen Kemper, Ellis, Li & McKinstry, Seattle, WA, Michael W. McConnell, H. Thomas Byron, III, Mayer, Brown & Platt, Washington, DC, for amicus, Telephone Association.

Richard A. Finnigan, Vandeberg, Johnson & Gandara, Tacoma, WA, for Washington

Independent Telephone Ass'n, intervenor-plaintiff.

Deborah Johnson Harwood, Vancouver, WA, for Pacific Telecom, Inc., intervenor-plaintiff.

## ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ROTHSTEIN, Chief Judge.

THIS MATTER comes before the court on cross-motions for summary judgment. Having considered the documents filed in support and in opposition, and having heard argument from counsel, the court finds and rules as follows:

## I. BACKGROUND

### A. The Parties

Plaintiff US WEST, Inc. ("US WEST"), a Colorado corporation, is the parent company of plaintiff US WEST Multimedia Communications, Inc. as well as plaintiff US WEST Communications, Inc., a common carrier providing local exchange telephone service in fourteen states, including Washington. These three entities wish to provide cable television service to the area served by US WEST Communications. Plaintiff Washington Independent Telephone Association ("WITA") is a non-profit trade association consisting of common carrier local telephone companies who provide service within Washington State. WITA includes many small and medium size companies, with service area ranges from as few as 75 access lines to as many as 600,000 access lines. Plaintiff Pacific Telecom, Inc. is a publicly-traded company with common carrier subsidiaries who provide local exchange telephone service in eleven states, including Washington.[1] Plaintiffs wish to provide cable television programming within their respective service areas and are precluded from doing so by the current prohibition contained in 47 U.S.C. § 533(b).

1. The court has also received briefing in support of plaintiffs' motion from amicus curiae United States Telephone Association ("USTA"). USTA is a non-profit trade association of local telephone companies across the nation.

Plaintiffs have named as defendants the Federal Communications Commission ("FCC") and the United States Attorney General, Janet Reno. Since plaintiffs challenge the constitutionality of a federal statute, the United States is also a defendant.

### B. The Challenged Statute

Plaintiffs challenge, on First Amendment grounds, the constitutionality of 47 U.S.C. § 533(b), which was enacted as part of 47 U.S.C. § 521 *et seq.*, the Cable Communications Policy Act of 1984 ("1984 Cable Act"). This section reads as follows:

553(b)(1) It shall be unlawful for any common carrier, subject in whole or in part to subchapter II of this chapter, to provide video programming directly to subscribers in its telephone service area, either directly or indirectly through an affiliate owned by, operated by, controlled by, or under common control with the common carrier.

(2) It shall be unlawful for any common carrier, subject in whole or in part to subchapter II of this chapter, to provide channels of communication or pole line conduit space, or other rental arrangements, to any entity which is directly or indirectly owned by, operated by, controlled by, or under common control with such common carrier, if such facilities or arrangements are to be used for, or in connection with, the provision of video programming directly to subscribers in the telephone service area of the common carrier.

47 U.S.C. Secs. 533(b)(1), (2).

"Video programming" is defined in the 1984 Cable Act as "programming provided by, or generally considered comparable to programming provided by, a television broadcast station." 47 U.S.C. § 522(19) (formerly § 602(16) of the 1984 Cable Act). The FCC has interpreted the language of the 1984 Cable Act "to prohibit only telephone company provision of programming comparable to that provided by broadcast television stations in 1984." *Second Report and Order, Recommendation to Congress, and Second Further Notice of Proposed Rulemaking,*

("*FCC Video Dialtone Order*"), 7 FCC Rcd. 5781, 5820 (1992).

In the case of *Chesapeake and Potomac Tel. Co. v. United States* ("*C & P*"), 830 F.Supp. 909, 914 (E.D.Va.1993), a similar challenge to § 533(b), the statute was held unconstitutional by United States District Court Judge Thomas Ellis III and is currently on appeal.

### C. The History of the Ban on Telephone Company Provision of Video Programming and Related Legislation/Regulation

#### 1. 1970 FCC Rule

In 1970, the FCC adopted a rule barring "all telephone common carriers from furnishing CATV [community antenna television system (i.e. cable video programming)] service to the viewing public in their operating territory except when, for good cause shown, a waiver of this policy is granted." *Applications of Telephone Companies for Section 214 Certificates for Channel Facilities Furnished to Affiliated Community Antenna Television Systems,* Final Report and Order, ("*Section 214 Applications Order*"), 21 FCC2d 307, 325 (1970).

In its 1970 Section 214 Applications Order, the FCC discussed the reasoning behind its new rule as follows:

The entry by a telephone company, directly or through an affiliate, into the retailing aspects of CATV services in the community within which it furnishes communications services can lead to undesirable consequences. This is because of the monopoly position of the telephone company in the community, as a result of which it has effective control of the pole lines (or conduit space) required for the construction and operation of CATV systems. Hence, the telephone company is in an effective position to preempt the market for this service which, at present, is essentially a monopoly service in most population centers. It can accomplish this by favoring its own or affiliated interest as against nonaffiliated interests in providing access to those pole lines or conduits....

*Section 214 Applications Order*, 21 FCC2d at 324, para. 46.

### 2. *1984 Enactment of the Cable Act*

In 1984 Congress codified the FCC's 1970 rule in the 1984 Cable Act, found at 47 U.S.C. § 533(b). There is little in the way of legislative history concerning § 533(b). Congress made no findings of fact at the time of its enactment. The single Congressional reference to the section at issue here, at the time of passage of the 1984 Cable Act, is found in the House Committee Report which states that the "intent of section [533(b) is] to codify current FCC rules concerning the provision of video programming over cable systems by common carriers, ..." H.R.Rep. No. 934, 98th Cong., 2d Sess. 56 (1984), U.S.Code Cong. & Admin.News 1984, pp. 4655, 4693.

Also in the House Report is a statement concerning the entire Section 533. As written at the time of the House Report, Section 533 contained prohibitions on cross-ownership between television broadcast stations and cable systems, between daily newspapers and cable systems, as well as the prohibition between ownership of telephone companies and cable programming providers. (The cross-ownership prohibitions as to newspapers and cable systems was deleted from the final version of the law.) The report contained a statement that § 533 "establishes clearly-defined cross-ownership rules and standards to prevent the development of local media monopolies and to encourage a diversity of ownership of communications outlets." *Id.*, at 55, U.S.Code Cong. & Admin.News 1984, p. 4692.

Finally, the "Purpose and Summary" of the entire 1984 Cable Act contains a general statement concerning the Act as a whole which states that "[t]he legislation also contains provisions to assure that cable systems provide the widest possible diversity of information services and sources to the public, ..." *Id.*, at 19, U.S.Code Cong. & Admin.News 1984, p. 4656.

### 3. *Recommendations of Repeal of § 533(b)*

Since the enactment of § 533(b) in 1984 there have been numerous recommendations

by the relevant federal agencies calling for its repeal. In addition, several House and Senate committees have considered bills repealing this section of the statute.

### a. FCC Recommendation of Repeal— 1992 Video Dialtone Order

In 1992, the FCC issued its Video Dialtone Order, the culmination of a five-year rulemaking process. *See* 7 FCC Rcd. 5781, 5784–5785 (1992). In this order, the FCC recommended that Congress repeal 47 U.S.C. § 533(b). The FCC recommended:

> that [Congress] amend the Cable Act to permit the local telephone companies to provide video programming directly to subscribers in their telephone service areas, subject to appropriate safeguards. We find that such an amendment would further promote our overarching goals in this proceeding by increasing competition in the video marketplace, spurring the investment necessary to deploy an advanced infrastructure, and increasing the diversity of services made available to the public. ...

*Video Dialtone Order*, 7 FCC Rcd at 5847, para. 135.

The FCC noted that when it adopted the cross-ownership ban in 1970

> the Commission intended to prevent local telephone companies from using their poles and conduits to disadvantage independent cable operator competitors. Therefore, by precluding telephone companies from providing video programming directly to subscribers, the ban gave cable television operators an opportunity to firmly establish themselves as viable competitors.

*Id.*, at 5848, para. 136 (footnote omitted).

In contrast, in its 1992 recommendation, after receiving public comment and studying the issue some five years, the FCC stated that it had concluded "that the risks of anticompetitive conduct by the local telephone companies in connection with the direct provision of video programming have been attenuated by the enormous growth of the cable industry." *Id.*, at 5848, para. 137.

In its Video Dialtone Order, the FCC also discussed how changes in the cable industry since 1970 had eliminated the rationales behind the 1970 rule. It stated that

> [w]hen the cross-ownership rules were adopted, cable television (then called CATV) reached approximately 9% of all homes and largely consisted of small, limited capacity systems in remote communities. Today, cable offers over 90 percent of American homes multichannel service and is now a $20 billion industry. Rather than a fledgling industry unable to compete, the cable industry holds a leading position in the delivery and provision of video programming to the American public. In this sense, the cross-ownership ban has fulfilled its purpose of ensuring that the cable industry is able to thrive. Given this widely changed competitive situation, we find it reasonable to conclude that, with appropriate safeguards on their entry, there is little threat that the local telephone companies could preemptively eliminate competition and monopolize the market for video programming services.

*Id.,* at 5848–5849, para. 137 (footnotes omitted).

Additionally, the FCC stated that "any remaining risk of anticompetitive conduct by the local telephone companies is outweighed by the potential public interest benefits their entry would bring" as the diversity of video programming will increase and because, as the Department of Justice had argued in its reply comments, "vertical integration should increase rather than reduce available video programming." *Id.,* at 5849, para. 138 (citing the Reply Comments of the United States Department of Justice "DOJ," *In re Telephone Company—Cable Television Cross Ownership Rules, "DOJ Cross–Ownership Rules Reply,"* CC Docket No. 87–266, at 44–45 (Mar. 13, 1992)).

In addition, the FCC found "that the public will benefit greatly from the resulting increased competition in the video marketplace." *Video Dialtone Order,* 7 FCC Rcd at 5850, para. 140.

### b. 1992 Recommendation of Repeal of § 533(b) by the Antitrust Division of the Department of Justice

In response to a proposed rulemaking by the FCC, which led to the Video Dialtone Order, the Communications and Finance Section of the Antitrust Division of the United States Department of Justice recommended that telephone companies, referred to as local exchange carriers ("LECs"), be permitted "to own and directly provide video programming." *DOJ Cross–Ownership Rules Reply, supra,* at 44. DOJ's response stated that "the Department believes that LEC provision of video programming will have procompetitive benefits that outweigh any anticompetitive risks involved." *Id.* In addition, DOJ indicated that its position was "consistent with its previous positions regarding the necessity of the cross ownership restriction" stating that where "the rationales for such restrictions are no longer valid, then they should be removed or, at least modified, to permit the marketplace to function freely" *Id.,* at 44, nt. 44.

DOJ enumerated the "procompetitive benefits" of allowing telephone companies to provide video programming, stating that "it will allow another competitor to enter the video programming market, ... entry will increase the LECs' willingness to take the financial risk of developing broadband integrated networks ... [and] vertical integration will allow them to achieve efficiencies." *Id.,* at 44–45.

Discussing vertical integration by the telephone companies, DOJ said that

> since the cable industry is already vertically integrated, it is unlikely that allowing the telephone companies to vertically integrate will have anticompetitive effects. It will just make them more effective competitors, and will create an alternative player with whom third parties can bargain to carry their programming.

*Id.,* at 45.

Contrary to the position that DOJ has taken in this litigation, it said in its 1992 Cross–Ownership Rules Reply that it "disagree[d] with those parties who argue that allowing the LECs to own and provide their own video programming will not be procom-

petitive because it will allow them to engage in anticompetitive behavior...." *Id.*, at 46, nt. 50.

As did the FCC, DOJ concluded that "because the benefits of allowing the LECs to provide video programming outweigh the anticompetitive risks involved they should be allowed to enter this market" and "support[ed] lifting the telephone company-cable television cross-ownership prohibition contained in the Cable Act." *Id.*, at 46–47.

**c. 1991 Report by the United States Department of Commerce Recommending Repeal of 533(b)**

In 1991, the National Telecommunications and Information Administration ("NTIA"), a branch of the United States Department of Commerce, stated that local exchange carriers ("LECs") "should be permitted to offer [video] programming in their service areas" if subject to appropriate safeguards developed by the FCC. *The NTIA Infrastructure Report*, at 233 (October 1991).

In its report, NTIA stated that "[w]ell-developed safeguards can address two of the 'traditional' concerns [of permitting LECs to provide video programming], regarding cross-subsidization and also discrimination, as evidenced by the history of pole attachment access and rates." *Id.* Specifically, the NTIA stated that the "FCC's accounting and cost allocation rules can adequately control the danger of cross-subsidization of a LEC's programming activities by its regulated operations" adding that "those rules are extensive and effective in controlling cross subsidy." *Id.*

NTIA also concluded that "[c]oncerns about discrimination, as in the case of pole attachments, can be addressed in several ways ..." noting that "there is an elaborate statutory and regulatory mechanism in place to address pole attachment disputes." *Id.* Additionally, NTIA stated that pole access concerns "should be less serious than in the past, since nearly 90 percent of U.S. homes have access to cable television today." *Id.* NTIA also noted that the "antidiscrimination and pro-efficiency requirements of [current FCC rules concerning the] provision of enhanced services would be effective ways to satisfy" antidiscrimination goals. *Id.* Final-

ly, NTIA concluded that "the likely benefits of LEC entry into the video programming business outweigh the potential costs of LEC provision of video programming, which either are overstated or can be effectively ameliorated by adapting existing regulatory safeguards." *Id.*, at 235.

Thus, the three expert federal agencies, including two of the defendants in this case, who have considered § 533(b), have unanimously concluded that it should be repealed.

**4. Senate and House Subcommittee Reports**

In addition to the concerns expressed by the FCC, DOJ and the NTIA surrounding § 533(b), several subcommittees of the House and Senate have considered numerous bills advocating its repeal. While the limited legislative history discussed above in Section I.C.2. is the extent of any mention of § 533(b) by Congress as a whole, several subcommittees of the House and Senate have held hearings on the repeal of § 533(b). *See C & P*, 830 F.Supp. at 914–915, nt. 9 (listing subcommittee hearings). Since 1989, six bills have been introduced attempting to repeal § 533(b). *See C & P*, 830 F.Supp. at 915, nt. 10 (listing bills introduced). However, Congress has not modified or repealed § 533(b), even in light of the agency recommendations discussed above.

The most recent statement by any part of Congress concerning § 533(b) is found in the 1991 Senate Report which accompanied the 1992 Cable Act (which altered the regulation of cable television) which states that the Senate Committee on Commerce, Science, and Transportation believed that the prohibition contained in § 533(b) "enhance[d] competition." S.R. No. 92, 102d Cong., 1st Sess., at 47 (1991), U.S.Code Cong. & Admin.News 1992, pp. 1133, 1180.

**D. Plaintiffs' Challenge to the Constitutionality of § 533(b)**

Plaintiffs wish to provide cable television programming within their respective service areas and are precluded from doing so by the current prohibition contained in 47 U.S.C. § 533(b). Plaintiffs contend that § 533(b)

abridges their rights of freedom of speech and freedom of the press in violation of the First Amendment of the United States Constitution, and move for summary judgment as to the unconstitutionality of the statute. Defendants have also moved for summary judgment, contending that § 533(b) is constitutional.

## II. DISCUSSION

### A. Summary Judgment Standard

The parties have cross-moved for summary judgment. A grant of summary judgment is appropriate if it appears, after viewing the evidence in the light most favorable to the opposing party, that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630–631 (9th Cir.1987); *Lew v. Kona Hospital*, 754 F.2d 1420, 1423 (9th Cir.1985). The court has determined that this case is appropriate for summary judgment as the legal issues involved may be resolved on the basis of uncontroverted facts.

### B. Applicable Level of Scrutiny

■ A critical issue in this case is what level of judicial scrutiny is appropriate to the review of § 533(b). Defendants contend that § 533(b) is an "antitrust measure" that only indirectly impacts speech and should be subjected only to the "rational basis review" applicable to such economic legislation. Thus, defendants argue, § 553(b) is constitutional if it is rationally related to a legitimate government objective.

Plaintiffs, however, argue that a higher level of scrutiny is required, because § 533(b) directly implicates the First Amendment as it prevents them from engaging in a speech and press activity. Further, plaintiffs argue that § 533(b) should be subject to the highest level of judicial scrutiny because it discriminates on the basis of the content of the plaintiffs' speech and discriminates between speakers. It is content-based, plaintiffs argue, because the FCC must view the content of the programming in order to determine if it is "comparable to that provided by broad-

cast television stations in 1984," *FCC Video Dialtone Order*, 7 FCC Rcd. at 5820, and is therefore prohibited by § 533(b). The statute is said to discriminate between speakers because it imposes this restriction only on telephone companies. Thus, plaintiffs contend, as a content-based restriction on speech it is "presumptively invalid." *R.A.V. v. City of St. Paul*, —— U.S. ——, ——, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305 (1992). To survive the applicable strict scrutiny, a content-based restriction must be "necessary to serve a compelling state interest ... [and] narrowly drawn to achieve that end." *Id.*

In the alternative, plaintiffs argue that § 533(b) is subject to at least intermediate level First Amendment scrutiny, thus requiring the statute to pass the test developed in *U.S. v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968), and its progeny.

This court agrees with plaintiffs that § 533(b) must be scrutinized using a higher standard than mere rational basis review. The Supreme Court has recognized video programming as a protected form of speech. *See Leathers v. Medlock*, 499 U.S. 439, 444, 111 S.Ct. 1438, 1442, 113 L.Ed.2d 494 (1991) (cable television is speech for First Amendment purposes). Section 553(b) directly abridges the plaintiffs' right to express themselves by prohibiting them from engaging in video programming. Section 533(b) is not a generally applicable economic law, nor does it concern the physically-limited airwaves of broadcast television. Therefore, the antitrust and broadcast cases cited by defendants are inapposite.

In any case, even if the statute were directed at non-speech activity, as defendants contend, it must be subjected to heightened scrutiny as it "impose[s] a disproportionate burden upon those engaged in protected First Amendment activities." *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 704, 106 S.Ct. 3172, 3176, 92 L.Ed.2d 568 (1986). *See also, Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 581, 103 S.Ct. 1365, 1369–70, 75 L.Ed.2d 295 (1983); *C & P*, 830 F.Supp. at 921–922 (the "Supreme Court has never accorded mere rationality review to a statute, even a 'struc-

tural' economic regulation, that, on its face, prohibited a specific category of speakers from engaging in a protected form of speech," citing *Arcara*, 478 U.S. 697, 106 S.Ct. 3172). At a minimum, therefore, the intermediate level of scrutiny as developed in *O'Brien* and subsequent cases, applies.

Intermediate scrutiny requires that restrictions on speech be "justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989) (quoting *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984)).

The parties correctly focus their attention on whether or not § 533(b) is sufficiently "narrowly tailored." To be "narrowly tailored" a restriction on speech "need not be the least-restrictive or least-intrusive means" of serving the governmental interest, *Ward*, 491 U.S. at 798–799, 109 S.Ct. at 2757–58, but it may not "burden substantially more speech than is necessary to further the government's legitimate interests." *Id.*, at 799, 109 S.Ct. at 2758. A relevant consideration for the court in making this determination is the reasonableness of the "fit" between ends and means. *City of Cincinnati v. Discovery Network, Inc.*, —— U.S. ——, ——, n. 13, 113 S.Ct. 1505, 1510, n. 13, 123 L.Ed.2d 99 (1993). In addition, the restriction may not "regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals," *Ward*, 491 U.S. at 799, 109 S.Ct. at 2758, and must "sufficiently serve those public interests that are urged as its justification" to be constitutional. *U.S. v. Grace*, 461 U.S. 171, 181, 103 S.Ct. 1702, 1709, 75 L.Ed.2d 736 (1983).

Because the court finds that § 533(b) fails to meet the narrowly tailored requirement of the *O'Brien* test and therefore fails the intermediate level of review, it is unnecessary to consider the application of the strict scrutiny test suggested by plaintiffs, as the statute

would, *a fortiori*, fail that more stringent test.

## C. Application of Intermediate Scrutiny

■ Section 533(b), when first adopted by the FCC as a regulation in 1970, and when enacted by Congress in 1984, may indeed have been narrowly tailored to serve the needs of the infant cable industry as it existed then. However, both sides in this case recognize that the cable industry has undergone radical changes and developments in the intervening years. As § 533(b) directly affects plaintiffs' First Amendment rights, this court must review the question of whether the statute is sufficiently narrowly tailored, in light of present circumstances, to justify its sweeping exclusion of plaintiffs from video programming activity. *See C & P*, 830 F.Supp. at 927.

In determining whether § 533(b) is "narrowly tailored to serve a significant governmental interest," the court must look to the present, "inevitable effect" and "necessary scope and operation" of the statute, *O'Brien*, 391 U.S. at 384, 88 S.Ct. at 1683, and "to the face of the regulation and the identifiable interests advanced to justify the regulation." *11126 Baltimore Blvd. v. Prince George's County*, 886 F.2d 1415, 1426 (4th Cir.1989), *vacated on other grounds*, 496 U.S. 901, 110 S.Ct. 2580, 110 L.Ed.2d 261 (1990); *see also Hart Book Stores, Inc. v. Edmisten*, 612 F.2d 821, 829 (4th Cir.1979), *cert. denied*, 447 U.S. 929, 100 S.Ct. 3028, 65 L.Ed.2d 1124 (1980); *See also Sable Communications of California, Inc. v. FCC*, 492 U.S. 115, 129, 109 S.Ct. 2829, 2838, 106 L.Ed.2d 93 (1989) (it is the court's "task in the end to decide whether Congress has violated the Constitution" and legislative findings of fact "would not foreclose our independent judgment of the facts bearing on an issue of constitutional law").

The defendants assert that § 533(b) serves to promote competition and to provide diversity of video programming because by keeping plaintiffs out of the business of providing video programming in their telephone service areas, § 533(b) prevents potential anticompetitive behavior by the telephone companies. The defendants have identified two potential anticompetitive practices in particular: the

potential for discrimination in access to telephone poles and conduits and the possibility of cross-subsidization between regulated telephone service and non-regulated video programming. In addition, defendants argue that the telephone companies have monopolistic tendencies which predispose them to anticompetitive behavior. The court addresses each of these asserted rationales in turn.

### 1. Pole and Conduit Access Discrimination

Defendants argue that telephone companies can discriminate against competitors by limiting pole and conduit access. The Pole Attachment Act of 1978, 47 U.S.C. § 224, has addressed the concerns about pole and conduit access, giving the FCC power to regulate the terms and conditions of pole attachments. In addition, cable service is now available, meaning that the cables are already in place, at 96% of all U.S. homes, as opposed to 9% in 1970. As a result, the FCC has concluded that there is "little threat that the local telephone companies could preemptively eliminate competition" in the video programming market by discriminating in pole access. *Video Dialtone Order*, 7 FCC Rcd. at 5849. Finally, as the *C & P* court discussed at length, telephone companies are already permitted, and do, engage in video transport services, the area in which potential problems of access are most relevant. *See C & P*, 830 F.Supp. at 929–931. Finally, any remaining access issues, if there are any, could be resolved by measures much less drastic than a total video programming ban which would not deprive plaintiffs of this important expressive opportunity. As it stands now, with respect to pole access, § 533(b) "burden[s] substantially more speech than is necessary to further the government's legitimate interests." *Id.*, 491 U.S. at 799, 109 S.Ct. at 2758.

### 2. Cross–Subsidization

Defendants contend that without § 533(b) the telephone companies will subsidize their video programming activities by passing on those costs to their telephone ratepayers. By improperly allocating the costs of the video programming to telephone ratepayers the telephone companies could earn supercompetitive profits which would enable them to undercut their competition and eventually the telephone companies might develop a monopoly in the video programming market. However, the FCC already has detailed cost allocation and accounting rules governing nonregulated activities of telephone companies to prevent cross-subsidization or cost-shifting to ratepayers. *See Separation of Costs of Regulated Telephone Service From Costs of Nonregulated Activities*, Report and Order, 2 FCC Rcd. 1298, Reconsid. Order, 2 FCC Rcd 6383 (1987), Order on Further Reconsid., 3 FCC Rcd. 6701 (1988), *aff'd sub nom. Southwestern Bell Corp. v. FCC*, 896 F.2d 1378 (D.C.Cir.1990). The FCC itself, in its Video Dialtone Order, stated that

> our existing safeguards with respect to nonregulated [telephone company] services are sufficient at this time to protect against cross-subsidization concerns.... we continue to believe that they constitute an effective means of preventing cross-subsidization between regulated and nonregulated services.

7 FCC Rcd. at 5828–5829. Thus, there is a lack of the required "fit" between the restrictions of § 533(b) and its purported purpose in preventing cross-subsidization.

### 3. Monopolistic Tendencies

Defendants argue that given the past history of monopolistic practices on the part of some telephone companies, together with their size and position in the marketplace, the public interest will best be served by excluding telephone companies from video programming. However, it is clear that in a direct sense the current ban actually *reduces* diversity of programming and *reduces competition* because it prohibits an entire group of potential video programmers from participating in the market and permits the near-absolute monopoly currently enjoyed by cable companies to remain undisturbed.

The plaintiff telephone companies agree that they are subject to the general antitrust statutes already in existence. In fact the Department of Justice "disagree[d]" with those parties who argue that allowing the

LECs to own and provide their own video programming will not be procompetitive because it will allow them to engage in anticompetitive behavior ...," *DOJ Cross-Ownership Rules Reply*, CC Docket No. 87–266, at 46, nt. 50, and accordingly recommended the repeal of § 533(b).

In the recommendations of the FCC, the NTIA and DOJ to Congress, advocating the repeal of § 533(b), various additional controls, all less restrictive of speech than § 533(b), have been suggested which would address the concerns of defendants and would prevent monopolistic behavior by the telephone companies. Such recommendations include imposing a cap on the percentage of channel capacity which may be used by the telephone company for providing its own programming, with the balance available to be leased on a common carrier basis to other programmers, *Video Dialtone Order*, 7 FCC Rcd. at 5850, as well as requiring that "the telephone companies provide video programming through a structurally separated video programming subsidiary." *Id.*, at 5847, para. 135.

Thus, despite the defendants' statements, there is no convincing evidence in the record that other current methods of regulating anti-competitive behavior would be ineffective. In addition, § 533(b) burdens substantially more speech than is necessary to effectuate the government's goals.

### III. CONCLUSION

The complete ban on telephone company participation in the provision of video programming in their service areas is an unnecessarily severe means of achieving the government's objectives. In fact, based on the evidence submitted, it appears that § 533(b) does not actually serve the interests it allegedly advances, and if it does serve these objectives, it does so in a manner that sacrifices the First Amendment rights of plaintiffs. As seen in the recommendations by the relevant expert federal agencies (the FCC, the NTIA, and the DOJ Antitrust Division), there are numerous alternatives to the complete prohibition, which would serve to advance and accomplish the same pro-competitive goals advanced by the defendants in this case, while not eliminating an important speech and press opportunity. Furthermore, there is always the concern for the public interest. A serious result of the ban is to deprive the public of access to a greater number of choices in video programming as well as the possibility of competitive pricing, directly contrary to the objectives defendants contend it serves.

The Supreme Court has held that " '[b]road prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone in an area so closely touching on our most precious freedoms.' " *Edenfield v. Fane*, — U.S. —, — – —, 113 S.Ct. 1792, 1803–1804, 123 L.Ed.2d 543 (1993) (quoting *NAACP v. Button*, 371 U.S. 415, 438, 83 S.Ct. 328, 340–41, 9 L.Ed.2d 405 (1963)). In the case at hand, there is a lack of the required "fit" described in *Discovery Network*, — U.S. at —, n. 13, 113 S.Ct. at 1510, n. 13 (1993), between § 533(b) and the interests identified by defendants.

As evidenced by the recommendations of the FCC, the NTIA, and the Antitrust Division of the DOJ, the cable industry has changed and regulatory alternatives exist that would permit video programming by telephone companies without the negative consequences identified by the defendants. The court finds that § 533(b) is not "narrowly tailored to serve a significant governmental interest," but instead, that the statute "burden[s] substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799, 109 S.Ct. at 2758.

Section 533(b) fails to meet the "narrowly tailored" requirement of the *O'Brien* test of constitutionality of restrictions on speech activity. The court finds it unnecessary to determine whether § 533(b) meets the other requirements of the *O'Brien* test, or whether the statute would survive strict scrutiny review. Accordingly, plaintiffs' motion for summary judgment is GRANTED and defendants' motion for summary judgment is DENIED.