**BELLSOUTH CORPORATION, Bellsouth Telecommunications, Inc., d/b/a South Central Bell Telephone Company and Southern Bell Telephone and Telegraph Co., and Bellsouth Interactive Media Services, Inc., Plaintiffs,**

v.

**UNITED STATES of America, Federal Communications Commission, and Janet Reno, in her official capacity as Attorney General of the United States of America, Defendants.**

No. CV 93–B–2661–S.

United States District Court,
N.D. Alabama,
Southern Division.

Sept. 23, 1994.

Atley A. Kitchings, Jr., Will M. Booker, Lange Simpson Robinson & Somerville, Birmingham, AL, Roger M. Flynt, Jr., Fred A. Walters, Bellsouth Telecommunications Inc., Atlanta, GA, Michael W. McConnell, Kenneth S. Geller, H. Thomas Byron, III, Mayer Brown & Platt, Washington, DC, Walter H. Alford, John F. Beasley, William B. Barfield, Thompson T. Rawls, II, Bellsouth Corp., Atlanta, GA, for Bellsouth Corp., Bellsouth Telecommunications, Inc. d/b/a South Central Bell Telephone Co. and Southern Bell Telephone and Telegraph Co., Bellsouth Interactive Media Services Inc.

Herbert J. Lewis, III, Walter Braswell, Acting U.S. Atty., Birmingham, AL, Frank W. Hunger, Theodore C. Hirt, Alina S. Kofsky, U.S. Dept. of Justice—Civil Div., Washington, DC, for U.S.

Herbert J. Lewis, III, Walter Braswell, Acting U.S. Atty., Birmingham, AL, Frank W. Hunger, U.S. Dept. of Justice—Civil Div., Washington, DC, for F.C.C., Janet Reno.

Joe R. Whatley, Jr., Cooper Mitch Crawford Kuykendall & Whatley, Birmingham, AL, for Georgia Cable Television Ass'n, Tennessee Cable Television Ass'n, amici.

Edward J. Ashton, Amsouth Bank Legal Dept., Birmingham, AL, James L. Gattuso, Washington, DC, Mark R. Paoletta, O'Connor & Hannah, Washington, DC, for Citizens for a Sound Economy Foundation, amicus.

Catherine Wang, Gene DeJordy, Swidler & Berlin, Washington, DC, for ADC Telecommunications, Inc., amicus.

### *MEMORANDUM OPINION*

BLACKBURN, District Judge.

This case involves a challenge to certain provisions of the Cable Communications Policy Act of 1984, 47 U.S.C. § 521–559 (1988 & Supp. IV 1992). Plaintiffs, BellSouth Corporation, BellSouth Telecommunications, Inc., and BellSouth Interactive Media Services, Inc., allege that subsections (1) and (2) of 47 U.S.C. § 533(b)[1] violate the Free Speech Clause of the First Amendment and the equal protection guarantee embodied in the Due Process Clause of the Fifth Amendment. Defendants are the Federal Communications Commission, the United States of America,

---

1. Section 533(b) states in relevant part:
   (1) It shall be unlawful for any common carrier ... to provide video programming directly to subscribers in its telephone service area, either directly to subscribers in its telephone service area, either directly or indirectly through an affiliate owned by, operated by, controlled by, or under common control with the common carrier.
   (2) It shall be unlawful for any common carrier ... to provide channels of communications or pole line conduit space, or other rental arrangements, to any entity which is directly or indirectly owned by, operated by, controlled by, or under common control with such common carrier, if such facilities or arrangements are to be used for, or in connection with, the provision of video programming directly to subscribers in the telephone service area of the common carrier....

and Attorney General Janet Reno, in her official capacity.[2]

After plaintiffs and defendants completed discovery, plaintiffs moved for summary judgment and defendants moved for judgment on the pleadings or, in the alternative, for summary judgment. For the reasons stated in this memorandum, the court has determined that plaintiffs' Motion for Summary Judgment is due to be granted and defendants' Motion for Summary Judgment is due to be denied.

### BACKGROUND

BellSouth Corporation is a holding company which owns BellSouth Telecommunications, Inc. ("BST"). BST provides local and intraLATA[3] telephone service in nine states.[4] BellSouth Corporation also owns BellSouth Interactive Media Services, Inc., a corporation formed for the purpose of providing video programming and related services. BellSouth's Evidentiary Appendix 1 [hereinafter BellSouth's App. 1], Tab C, Affidavit of William F. Reddersen, ¶ 1.

Under § 533(b), plaintiffs and their affiliates cannot provide video programming[5] directly to their telephone subscribers within the nine-state area served by BST. Plaintiffs are allowed by the terms of § 533(b), however, to provide video programming outside their telephone service area. It is the restriction on providing video programming to their own subscribers within the BST nine-state service area which is before the court for constitutional analysis.

In deciding this question, this court must, based on numerous Supreme Court decisions on First Amendment issues, determine that there is in fact prohibited speech of some kind, determine the appropriate level of judi-cial scrutiny, and then determine whether the statute passes constitutional muster under that level of scrutiny.

■ There can be no disagreement that § 533(b) is a prohibition on speech protected by the First Amendment. See Turner Broadcasting, —— U.S. at ——, 114 S.Ct. at 2456.

Without restating all of the case law on First Amendment issues, most of which is recited in the recent Supreme Court case of Turner Broadcasting, there are three levels of scrutiny that might apply in assessing the constitutionality of § 533(b):

(1) strict scrutiny, which applies to a content-based or speaker-specific ban;

(2) intermediate scrutiny, which applies to a content-neutral ban; or

(3) rational basis scrutiny, which applies to an incidental ban on speech.

### DISCUSSION

Plaintiffs contend that the effect of § 533(b) is to deny them a fundamental right under the First Amendment. They argue that under an analysis of either strict or intermediate scrutiny, the statute must be stricken.

■ Relying on F.C.C. v. National Citizens Commission for Broadcasting, 436 U.S. 775, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978), and Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945), defendants argue that § 533(b) does not violate the First Amendment if § 533(b) is rationally related to a legitimate governmental interest. In National Citizens Commission, the Supreme Court held the First Amendment did not prohibit an F.C.C. rule preventing news-

2. The Georgia Cable Television Association, Tennessee Cable Television Association, Citizens For a Sound Economy Foundation, and ADC Telecommunications, Inc., filed memoranda with the court as amici curiae.

3. The term "LATA" stands for Local Access and Transport Area. United States v. Western Elec. Co., 569 F.Supp. 990, 994 n. 9 (D.D.C.1983).

4. These states are Alabama, Florida, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, South Carolina, and Tennessee.

5. Under 47 U.S.C. § 522(19), "the term 'video programming' means programming provided by, or generally considered comparable to programming provided by, a television broadcast station." The Supreme Court has recognized that video programming constitutes speech protected by the First Amendment. See Turner Broadcasting Sys. v. F.C.C., —— U.S. ——, ——, 114 S.Ct. 2445, 2456, 129 L.Ed.2d 497 (1994).

papers from owning broadcasting stations in the same community. 436 U.S. at 798, 98 S.Ct. at 2114. As the Supreme Court recently has made clear, *National Citizens Commission* and a related line of cases [6] rest on the broadcast industry's electromagnetic spectrum being a scarce resource. In those broadcast cases, extensive regulation is justified in ensuring that a diversity of viewpoints can utilize the limited broadcast spectrum which is available. *See Turner Broadcasting,* ―― U.S. at ――――――, 114 S.Ct. at 2456–57.

The *National Citizens Commission* line of cases does not justify restrictions on speech in the cable television industry as the cable industry does not rely on the physically scarce electromagnetic spectrum to convey messages. *Turner Broadcasting,* ―― U.S. at ――, 114 S.Ct. at 2457. Therefore, the rational basis level of review endorsed by *Red Lion Broadcasting,* 395 U.S. at 386–95, 400–01, 89 S.Ct. at 1804–09, 1812, and the other broadcast cases is not appropriate in reviewing the constitutionality of § 533(b). *See Turner Broadcasting,* ―― U.S. at ――, 114 S.Ct. at 2457.

In *Turner Broadcasting,* the Supreme Court held that *Associated Press* does not allow Congress to restrict speech simply because the restriction rationally relates to a legitimate governmental interest. *Turner Broadcasting,* ―― U.S. ――, 114 S.Ct. at 2458. The Court wrote:

> *Associated Press* ... involved actions against members of the press brought under the Sherman AntiTrust Act, a law of general application. But while the enforcement of a generally applicable law may or may not be subject to heightened scrutiny under the First Amendment, ... laws that single out the press or certain elements thereof, for special treatment "pose a particular danger of abuse by the State," ... and so are always subject to at least some degree of heightened First Amendment scrutiny.

*Id.* (citations omitted). Section 533(b) singles out telephone companies and their affiliates for special treatment: only those companies are subject to the restrictions set forth in that law. Therefore, to comply with the First Amendment, the restriction on speech in § 533(b) must do more than rationally relate to a legitimate governmental interest. As a result, the degree of scrutiny to be utilized by this court in its analysis is either strict, under *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 231, 107 S.Ct. 1722, 1729, 95 L.Ed.2d 209 (1987), or intermediate, under *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968).

■ Plaintiffs first argue that § 533(b) amounts to a content-based restriction on speech and, as such, mandates strict scrutiny. A content-based restriction on speech violates the First Amendment unless the restriction is necessary to vindicate a compelling governmental interest and is narrowly drawn to achieve that purpose. *Arkansas Writers' Project,* 481 U.S. at 231, 107 S.Ct. at 1729. Defendants emphasize that the purposes behind § 533(b) do not include a desire to suppress ideas or viewpoints. Thus, defendants argue, strict scrutiny does not apply to § 533(b).

In a similar challenge to § 533(b) by another telephone utility, the court in *Chesapeake & Potomac Tel. Co. v. United States,* 830 F.Supp. 909 (E.D.Va.1993), stated that a strict scrutiny analysis was inappropriate.[7] In *Chesapeake & Potomac,* as in this case, the government argued that § 533(b) served to promote a diversity of ownership in the media and to prevent telephone companies from engaging in anti-competitive conduct. 830 F.Supp. at 924. The *Chesapeake & Potomac* court emphasized that the asserted justifications for § 533(b) were content-neutral,

---

**6.** *See, e.g., F.C.C. v. League of Women Voters,* 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984); *Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); *National Broadcasting Co. v. United States,* 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943).

**7.** The only other court to consider the constitutionality of § 533(b) did not address the application of strict scrutiny to the statute, finding that, as it did not "meet the 'narrowly tailored' requirement of the *O'Brien* test," a strict scrutiny analysis was not necessary. *US WEST, Inc. v. United States,* 855 F.Supp. 1184, 1191 (W.D.Wash.1994).

that is, the justifications were not related to suppressing particular ideas or viewpoints. *Id.* at 926. Relying on *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), the district court reasoned that § 533(b) should not be subjected to strict scrutiny, in light of the content-neutral purpose of the statute. 830 F.Supp. at 924. This court substantially agrees with the analysis of *Renton* in *Chesapeake & Potomac* and finds that *Renton* precludes the application of strict scrutiny to § 533(b).[8]

■ The court finds, however, that the heightened or intermediate scrutiny described in *O'Brien* should apply to § 533(b). Under *O'Brien,* content-neutral regulation of speech survives scrutiny only if:

> it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

391 U.S. at 377, 88 S.Ct. at 1679. The Supreme Court has distinguished clearly between the two most important parts of the *O'Brien* test: first, whether the law in question "furthers an important or substantial governmental interest," and second, whether the law's "restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *See Turner Broadcasting,* —— U.S. at ——, 114 S.Ct. at 2469 (quoting *O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679). Under the *O'Brien* test, narrow tailoring requires that the restriction not "burden substantially more speech than is necessary to further the government's legitimate interests." *Id.* (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 799, 109 S.Ct. 2746, 2758, 105 L.Ed.2d 661 (1989)); *see US WEST,* 855 F.Supp. at 1191.

■ In this case, defendants have alleged two substantial governmental interests to justify § 533(b)'s ban against telephone companies providing video programming to subscribers in a company's telephone service area:

> Briefly stated, the "prohibition" set forth in 47 U.S.C. § 533(b) serves two important governmental interests: The promotion of diversity of ownership of local media outlets, and the prevention of anti-competitive conduct, such as cross-subsidization, network discrimination, and pole/conduit discrimination by local telephone companies in cable markets.

BellSouth's App. 1, Tab H, Defendants' Responses to Plaintiffs' First Set of Interrogatories, Response to Interrogatory No. 1.[9]

---

**8.** In addition, in *Turner Broadcasting,* the United States Supreme Court held that even though the F.C.C. rule burdened one class of speakers (cable) but not another (broadcasters), the F.C.C. rule in question did not warrant a strict scrutiny analysis. —— U.S. at —— – ——, 114 S.Ct. at 2468–69. There, the Court held that "such heightened scrutiny is unwarranted when the differential treatment is 'justified by some special characteristic of' the particular medium being regulated." *Id.* at ——, 114 S.Ct. at 2468 (citation omitted).

**9.** It is interesting to note that although the Government contends that § 533(b) promotes a substantial governmental interest, the Government apparently has concluded that the statute does not in fact promote the interests it advances in this litigation:

As stated in pleadings by the Department of Justice:
> Allowing telephone companies to own and directly provide video programming in their local exchange areas, subject to Commission safeguards, will have procompetitive benefits

that outweigh any anticompetitive risks involved.
BellSouth's App. 1, Tab A, Significant Statements by the Defendants Made in the Public Record, Item 1.3, Reply Comments of the United States Department of Justice Before the F.C.C. in In the Matter of: Telephone Company–Cable Television Cross Ownership Rules, F.C.C. Doc. No. 87–266, at 6–7. The Assistant Attorney General herself stated before Congress:
> Policymakers should encourage added competition to cable television from other firms and technologies, which will reduce the market power that existing cable operators maintain in their market throughout the country. Statutory and regulatory restrictions that prevent such competition therefore should be removed.
BellSouth's Public Documents [hereinafter BellSouth's Pub.Doc.], Vol. 1, Tab 7, Statement of Anne K. Bingaman, Assistant Attorney General, Antitrust Division, Before the Subcommittee on Telecommunications and Finance at 7–9 (Jan. 27, 1994).
The F.C.C. has also noted that, with appropriate safeguards, amending the Cable Act to permit local telephone companies to provide video pro-

These two interests are closely related. *See Chesapeake & Potomac*, 830 F.Supp. at 927.

When the Government asserts such interests in support of a restriction on speech, however, the Supreme Court (speaking through a plurality of the Court) has described a significant burden of proof. As stated in *Turner Broadcasting:*

> That the Government's asserted interests are important in the abstract does not mean, however, that the must-carry rules will in fact advance those interests. When the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply "posit the existence of the disease sought to be cured." *Quincy Cable TV, Inc. v. F.C.C.*, 768 F.2d 1434, 1455 (CADC 1985). It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way. *See Edenfield v. Fane*, 507 U.S. ——, ——–——, 113 S.Ct. 1792, 1798–99, 123 L.Ed.2d 543 (1993); *Los Angeles v. Preferred Communications, Inc.*, 476 U.S., [488] at 496 [106 S.Ct. 2034, 2038, 90 L.Ed.2d 480] [ (1986) ] ("This Court may not simply assume that the ordinance will always advance the asserted state interests sufficiently to justify its abridgment of expressive activity") (internal quotation marks omitted); *Home Box Office, Inc. v. F.C.C.*, 567 F.2d 9, 36 (CADC 1977) ("[A] 'regulation perfectly reasonable and appropriate in the face of a given problem may be highly capricious if that problem does not exist' ") (citation omitted).

Thus, in applying *O'Brien* scrutiny we must ask first whether the government has adequately shown that the economic health of local broadcasting is in genuine jeopardy and in need of the protections afforded by must-carry. Assuming an affirmative answer to the foregoing question, the Government still bears the burden of showing that the remedy it has adopted does not "burden substantially more speech than is necessary to further the government's le-

gitimate interests." *Ward*, 491 U.S., at 799 [109 S.Ct., at 2758]. . . .

—— U.S. at ——, 114 S.Ct. at 2470 (emphasis added).

The defendants in this case have submitted volumes of evidence in support of their position that § 533(b) promotes diversity of ownership of video programming companies. However, the undisputed facts show that although cable television companies serve over ninety percent of homes in the United States, most subscribers have no opportunity to select between competing cable systems. BellSouth's Pub.Doc., Vol. 1, Tab 2, Video Dialtone Order, 7 F.C.C.R. 5781, 5854 (1992); Public Documents Cited in Defendants' Motion for Judgment on the Pleadings or in the Alternative for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment, Vol. 9, Tab 17, Cable Television Consumer Protection and Competition Act of 1992, Pub.L. 102–385, § 2(a)(2), 106 Stat. 1460 (1992). Indeed, an analysis of the record shows that § 533(b) has diminished, not enhanced, the widest possible dissemination of divergent views and opinions. BellSouth's App. 1, Tab G, Affidavit of William E. Lee, ¶¶ 14–16; BellSouth's App. 1, Tab F, Affidavit of Thomas W. Hazlett, ¶¶ 3–12. *See Chesapeake & Potomac*, 830 F.Supp. at 927 ("Section 533(b), which serves to bar entry into the market for video transport service by the one class of potential competitors that has exhibited an inclination to compete with the entrenched monopolists, clearly operates in the first instance to restrict competition in the market for video programming by limiting the number of outlets through which such programming can be distributed."). .

Nonetheless, without deciding whether defendants have done no more than "posit the existence of the disease sought to be cured," or whether defendants have "demonstrate[ed] that the recited harms are real, not merely conjectural," the court holds that § 533(b) cannot survive intermediate scrutiny, as discussed below. As applied to telephone companies involved in video programming, the statute is not a narrowly tailored

---

gramming directly to subscribers in their telephone service areas would increase competition in the video marketplace and increase the diver-

sity of services made available to the public. *See* BellSouth's Pub.Doc., Vol. 1, Tab 2, Video Dialtone Order, 7 F.C.C.R. at 5847, ¶ 135.

means of promoting diversity or of preventing the stated forms of anti-competitive conduct.

■ The Government must show affirmatively that the limitation on speech embodied in § 533(b) meets not one but both prongs of the *O'Brien* analysis. The statute must promote a substantial governmental interest, and be narrowly tailored to achieve that end.[10] Here, BellSouth has offered evidence that existing regulatory controls are effective, less restrictive alternatives to § 533(b).[11] In addition, should existing regulations be insufficient to halt anticompetitive action by telephone companies, more restrictive regulations could be enacted. The F.C.C.'s current recommendation to Congress for repeal of § 533(b) includes an anticipated requirement "that the provision of video programming directly to subscribers by the local telephone companies be limited initially to a specified percentage of common carrier capacity." BellSouth's Pub.Doc., Vol. 1, Tab 2, Video Dialtone Order, 7 F.C.C.R. at 5850. As the Commission noted, "such a requirement at the present time would bring the public the benefits we have identified, but minimize the potential for anticompetitive abuses...." BellSouth's Pub.Doc., Vol. 1, Tab 2, Video Dialtone Order, 7 F.C.C.R. at 5851. In addition, the Commission recommended to Congress that "if the benefits exceed the costs, the telephone companies provide video programming through a structurally separated video programming subsidiary." BellSouth's Pub.Doc., Vol. 1, Tab 2,

Video Dialtone Order, 7 F.C.C.R. at 5847. The Government has not shown that existing regulatory controls or, for that matter, other substantially less restrictive safeguards, would be ineffective. *See Ward,* 491 U.S. at 799, 109 S.Ct. at 2758.

Defendants contend that if plaintiffs are allowed to provide video programming, they would acquire an incentive to "cross-subsidize" that business. As a result, plaintiffs would have an unfair competitive advantage in pricing the service to consumers. The court finds that in spite of any such opportunity/incentive, the alternative regulations identified by plaintiffs are less restrictive than a total ban on speech. *See, e.g.,* BellSouth's App. 1, Tab D, Affidavit of Charles J. Lathram, ¶ 7 (discussing F.C.C. rules designed to prevent cost allocation).[12]

Defendants have argued also that in allowing plaintiffs to provide video programming over a common carrier will encourage plaintiffs to discriminate against other providers also using the same conduit. Even defendant F.C.C. has considered and rejected the claim that the threat of network discrimination justifies a total ban on speech. In the Video Dialtone Order, the F.C.C. stated:

[I]n addition to the above accounting safeguards designed to prevent cross-subsidization between regulated and nonregulated services, the BOCs are also subject to a comprehensive regulatory framework designed to protect against discrimination and other anticompetitive conduct....

---

10. The restriction need not be the least restrictive or least intrusive means of serving the government interest, but it must not burden "substantially more" speech than is necessary. *See Turner Broadcasting,* —— U.S. at ——, 114 S.Ct. at 2469.

11. Plaintiffs offered the Affidavit of Charles J. Lathram, Chief Accountant for BST, who noted that "[t]he F.C.C. has adopted an array of 'safeguards' that effectively preclude any BOC from exploiting monopoly (basic telephone) services to gain an unfair competitive advantage in the provision of unregulated services, including enhanced services." BellSouth's App. 1, Tab D, Affidavit of Charles J. Lathram, ¶ 7.

12. In its Video Dialtone Order the F.C.C. noted: [O]ur existing safeguards with respect to nonregulated services are sufficient at this time to protect against cross-subsidization con-

cerns.... [T]he Commission presently has in place a comprehensive system of cost allocation rules and cost accounting safeguards designed to separate nonregulated service costs from regulated service costs. In addition, we have recently strengthened these cost accounting safeguards in order to ensure that the Commission is able to prevent and detect abuses should they occur. To the extent that a local telephone company provides nonregulated services as part of video dialtone, these safeguards will apply fully. Based upon our experience with such safeguards, we continue to believe that they constitute an effective means of preventing cross-subsidization between regulated and nonregulated services. BellSouth's Pub.Doc., Vol. 1, Tab 2, Video Dialtone Order, 7 F.C.C.R. at 5828–29 (emphasis added).

... [A]ll service providers will be entitled to access to the video dialtone platform on a tariffed, nondiscriminatory basis. BellSouth's Pub.Doc., Vol. 1, Tab 2, Video Dialtone Order, 7 F.C.C.R. at 5829–31 (footnote omitted); *see also* BellSouth's App. 1, Tab C, Affidavit of William L. Reddersen, ¶ 4 (describing the offering of video transport on a common carrier basis); BellSouth's App. 1, Tab D, Affidavit of Charles J. Lathram, ¶ 4 (further describing same). Thus, it is clear that the accounting safeguards and comprehensive regulatory framework are less restrictive means of preventing network discrimination.

Defendants also contend that § 533(b) prevents pole and conduit access discrimination by telephone utilities. Originally, in 1970, the F.C.C. adopted the regulatory predecessor to § 533(b) to satisfy a concern that telephone company ownership of pole and conduit space provided an opportunity for telephone companies to deny access to cable companies seeking pole attachment or conduit space. *See* BellSouth's Pub.Doc., Vol. 2, Tab 24, In the Matter of Applications of Telephone Companies for Section 214 Certificates for Channel Facilities Furnished to Affiliated Community Antenna Television Systems (Final Report and Order), 21 F.C.C.2d 307, *reconsideration in part,* 22 F.C.C.2d 746 (1970), *aff'd sub nom. General Tel. Co. v. United States,* 449 F.2d 846 (5th Cir.1971). At the time, the cable industry (then called Community Antenna Television) was in its infancy. Since that time, cable has become entrenched firmly in communities across the country.

In 1978, Congress enacted 47 U.S.C. § 224 (1998), to ensure the absence of pole and conduit access discrimination. This statute regulates the terms and conditions of such access. Even the F.C.C. has found that the problem of pole access no longer justifies the ban in § 533(b). BellSouth's Pub.Doc., Vol. 2, Tab 25, F.C.C. Staff Report on Cable T.V. Cross Ownership Policies at 162 (1981). To the extent that any concern in this area remains, the F.C.C. has determined that existing regulations are adequate to resolve any difficulty. BellSouth's Pub.Doc., Vol. 1, Tab 9, Further Notice of Inquiry and Notice of Proposed Rulemaking, 3 F.C.C.R. 5849, 5854, 5871 n. 16 (1988); *see also* BellSouth's Pub. Doc., Vol. 1, Tab 4, The NTIA [National Telecommunications and Information Administration] Infrastructure Report at 233 (1991). This court agrees with the following observation in *Chesapeake & Potomac:*

> [T]o the extent that the existing Pole Attachment Act does not entirely prevent the possibility of pole access discrimination, effective legislation could be passed to guarantee non-discriminatory access. If discriminatory pole access were the sole concern of Congress in enacting a prophylactic ban on the telephone company's ability to speak through video programming, then such a ban would plainly burden more speech than necessary to further the government's interests.

830 F.Supp. at 929–30 n. 29.

Section 533(b) is not a narrowly tailored means of preventing pole/conduit discrimination. Even assuming that the alleged ills prevented by § 533(b)'s ban are real, the Government has not shown that less restrictive regulations would be ineffective.

■■■■■ Finally, defendants urge this court to defer to Congressional judgment and to accord that judgment great weight in its analysis of the statute. Although the court will certainly give due deference to Congress, particularly when Congress has made findings based upon a record of evidence amassed by it, total deference is not appropriate.[13] The court is required to conduct its

---

13. Because Congress never made formal findings of fact when enacting the legislation now codified as § 533(b), the court hesitates to give Congress that degree of deference which defendants urge. Defendants assert that Congress supports the arguments that defendants make in their briefs, because Congress has not repealed § 533(b), despite having heard testimony from witnesses who supported repeal of § 533(b) during sessions when other telecommunications legislation was under consideration. Defendants' argument suffers from two flaws. First, the relevant legislative history merely indicates Congress' continuing interest in considering whether to repeal § 533(b). That history does not indicate an affirmative finding that there exist no less restrictive alternatives. *See* S.Rep. No. 92, 102d Cong., 2nd Sess. 18 (1991), *reprinted in* 1992

own examination of the evidence, as it has done in this case.[14] As recognized in *Turner Broadcasting,* a court must determine independently whether the government has unlawfully impinged on First Amendment rights. *Turner Broadcasting,* —— U.S. at ——, 114 S.Ct. at 2471. When the exercise of First Amendment rights is at stake, this court cannot simply substitute ·legislative judgment for judicial judgment. This is particularly appropriate where, as here, Congress made no findings of fact at the time it adopted then existing F.C.C. regulations and codified them as § 533(b).[15]

Because § 533(b) is not a narrowly tailored means of accomplishing the goals which defendants advance, the law violates the First Amendment. Because the court finds that § 533(b) violates the First Amendment, the court need not decide whether the law also violates the Fifth Amendment.

### CONCLUSION

For the reasons set forth in this memorandum, the court contemporaneously will enter its order granting plaintiffs' motion for summary judgment and enjoining defendants from enforcing the law against the plaintiffs in this action.

### ORDER

In accordance with the Memorandum Opinion entered contemporaneously herewith, the plaintiffs' Motion for Summary Judgment filed on May 9, 1994, is **GRANTED** as no genuine issue of material fact exists herein and plaintiffs are entitled to judgment as a matter of law. Defendants' Motion for Judgment on the Pleadings, or in the alternative Motion for Summary Judgment filed on June 1, 1994, is **DENIED**.

The court **ENJOINS** the Federal Communications Commission, the United States of America, and Attorney General Janet Reno (in her official capacity) from enforcing 47 U.S.C. § 533(b) against BellSouth Corporation, BellSouth Telecommunications, Inc., BellSouth Interactive Media Services, Inc., or any affiliate of BellSouth Corporation, BellSouth Telecommunications, Inc., or BellSouth Interactive Media Services, Inc.

All parties shall bear their own costs.

---

U.S.C.C.A.N. 1133, 1150, 1151. Second, "failed legislative proposals are 'a particularly dangerous ground on which to rest an interpretation of a prior statute.'" *Central Bank v. First Interstate Bank,* —— U.S. ——, ——, 114 S.Ct. 1439, 1453, 128 L.Ed.2d 119 (1994) (quoting *P.B.G.C. v. LTV Corp.,* 496 U.S. 633, 650, 110 S.Ct. 2668, 2678, 110 L.Ed.2d 579 (1990)).

**14.** The record in this case is extensive, consisting of thousands of pages of documents, expert affidavits, and joint stipulations of fact. It is unlikely that the parties could present significant evidence not already appearing in this record.

**15.** For a discussion of the legislative history of the 1984 Cable Act, see *US WEST,* 855 F.Supp. at 1186–1189 and *Chesapeake & Potomac,* 830 F.Supp. at 912–15.