**AMERITECH CORPORATION, Illinois Bell Telephone Company, and Michigan Bell Telephone Company, Plaintiffs,**

**and**

**Consolidated Communications, Inc. and Illinois Consolidated Telephone Company, Intervenor–Plaintiffs,**

**v.**

**UNITED STATES of America, Federal Communications Commission, and Janet Reno, in her official capacity as Attorney General of the United States of America, Defendants.**

Nos. 93 C 6642, 94 C 4089.

United States District Court,
N.D. Illinois,
Eastern Division.

Oct. 28, 1994.

Albert Calille, Michigan Bell Telephone Co., Detroit, MI, Howard J. Roin, Christine Ann Pagac, Michael W. McConnell, Mayer, Brown & Platt, Chicago, IL, and Thomas Byron H., III, Mayer, Brown & Platt, Washington, DC, for plaintiffs.

Linda A. Wawzenski, U.S. Attys. Office, Chicago, IL, James J. Gilligan, U.S. Dept. of Justice, Civ. Div., Washington, DC, and L. Michael Wicks and Daniel R. Hurley, U.S. Attys. Office, Chief Affirmative Litigation Div., Detroit, MI, for defendants.

Joseph A. Morris, Morris, Rathnau & De-LaRosa; Santiago A. Durango, Bell & McGurk, Ltd.; and James Arthur McGurk, Chicago, IL, for amici curiae.

Allan Horwich and Owen Eliot MacBride, Schiff, Hardin & Waite, Chicago, IL, for intervenors-plaintiffs.

Thomas W.B. Porter and Donald S. Young, Dykema Gossett, Detroit, MI, for movants.

### *MEMORANDUM OPINION*

GRADY, District Judge.

Ameritech Corporation and Illinois Bell Telephone Company filed this lawsuit against defendants United States of America, the Federal Communications Commission ("FCC"), and Janet Reno, in her official capacity as the Attorney General of the United States (collectively "the Government"), seeking a declaratory judgment and injunctive relief under 28 U.S.C. §§ 2201 and 2202. The lawsuit raises a First Amendment challenge to a provision of the Cable Communications Policy Act of 1984, 47 U.S.C. § 533(b), which prohibits the plaintiff local and regional telephone companies from providing cable television directly to customers within their service areas.

On the same date, Ameritech and Michigan Bell Telephone Company filed a virtually identical action against the same defendants in the Eastern District of Michigan. *See Ameritech Corp. v. United States,* No. 93–CV–74617–DT (E.D.Mich. Nov. 1, 1993). On June 14, 1994, United States District Judge

Patrick J. Duggan transferred the Michigan action to this court for consolidation with the action filed here. The Michigan case (N.D.Ill. No. 94 C 4089) has been consolidated for all purposes with this case (No. 93 C 6642).

The court has granted two additional parties, Consolidated Communications, Inc. ("CCI") and Illinois Consolidated Telephone Co. ("ICTC"), leave to intervene as plaintiffs in this action.

Now before the court are the parties' cross-motions for summary judgment. After considering the parties' briefs, which were originally filed in the Michigan action, along with the parties' supplemental memoranda and the submissions of the *amici curiae* in this case, the court grants plaintiffs' motions for summary judgment and denies defendants' motion, for the reasons discussed below.

### BACKGROUND

Cable television is defined broadly as a communications medium in which video programs are transmitted to the homes of subscribers along a closed network of wires or cables, which are often buried underground or attached to utility poles. Cable television differs from broadcast television in that the latter's signals can be received free of charge through the air with a standard television set and antenna. Cable operators ordinarily charge their subscribers a monthly fee for the transmission of video programs along the cable network. Cable is believed to have been born in 1948 in rural Pennsylvania and Oregon, where a handful of entrepreneurs sought to bring television to residents who were too far away from the nearest broadcasting station to pick up the signal through the air.[1] Today the cable television industry is a $20 billion business with access to more than 90 percent of American homes, according to the FCC. *In re Telephone Company–Cable Television Cross–Ownership Rules, Second Report and Order, Recommendation to Congress, and Second Further Notice of Proposed Rulemaking,* 7 FCC Rcd. 5781, 5848 (1992) (*"FCC Video Dialtone Order"*) (Plaintiff's Motion for Summary Judgment,

App. Tab 5). Congress has found that more than 60 percent of American households with television sets actually subscribe to cable, and that for these households, cable has replaced broadcast television as the primary provider of video programming. *See Turner Broadcasting Sys., Inc. v. FCC,* —— U.S. ——, ——, 114 S.Ct. 2445, 2454, 129 L.Ed.2d 497 (1994).

A detailed discussion of the relevant regulatory history of the cable television industry is contained in *US West, Inc. v. United States,* 855 F.Supp. 1184, 1186–88 (W.D.Wash.1994). To summarize, the FCC in 1970 issued a rule prohibiting telephone companies from providing cable television service to customers in their service areas, citing the likelihood of "undesirable consequences" stemming from "the monopoly position of the telephone company in the community, as a result of which it has effective control of the pole lines (or conduit space) required for the construction and operation of CATV [cable] systems." *Id.* at 1186 (quoting *Applications of Telephone Companies for Section 214 Certificates for Channel Facilities Furnished to Affiliated Community Antenna Television Systems,* Final Report and Order, 21 FCC2d 307, 324 (1970)). Congress codified the 1970 FCC rule in the Cable Communications Policy Act of 1984:

(1) It shall be unlawful for any common carrier ... to provide video programming directly to subscribers in its telephone service area, either directly or indirectly through an affiliate owned by, operated by, controlled by, or under common control with the common carrier.

(2) It shall be unlawful for any common carrier ... to provide channels of communication or pole line conduit space, or other rental arrangements, to any entity which is directly or indirectly owned by, operated by, controlled by, or under common control with such common carrier, if such facilities or arrangements are to be used for, or in connection with, the provision of video programming directly to subscribers in the

---

1. For an outline of cable television's early history, see Matt Stump & Harry Jessel, *Cable: The*

*First Forty Years,* Broadcasting, Nov. 21, 1988, at 35.

telephone service area of the common carrier.

47 U.S.C. § 533(b)(1), (2).

The term "common carrier" includes telephone companies, which carry interstate wire communications for hire. *See* 47 U.S.C. § 153(h). "Video programming" is defined as "programming provided by, or generally considered comparable to programming provided by, a television broadcast station." 47 U.S.C. § 522(19). The FCC has interpreted that definition as including any video programming comparable to that provided by broadcast television in 1984, the year of enactment. *FCC Video Dialtone Order,* 7 FCC Rcd. at 5820. By prohibiting telephone companies from providing "video programming," § 533(b) on its face keeps telephone companies out of the television business altogether in the companies' service areas. Because the plaintiff telephone companies, by virtue of their existing telephone service networks, are in a position to provide video programming along those networks to their telephone subscribers, § 533(b) affects plaintiffs most acutely by preventing them from competing in the potentially lucrative cable television market. Thus plaintiffs challenge the statute as being unconstitutional "on its face" and "as applied." The statute's applicability to over-the-air television broadcasting by plaintiffs' is not at issue, as plaintiffs apparently have no interest in broadcasting.

The parties do not dispute that by its terms, § 533(b) does not bar telephone companies from providing: video programming to consumers outside their service areas; other information services taking the form of visual images—but not "video programming"—to consumers within their service areas; or, video programming to any consumer, if such programming is transmitted indirectly through some other independent entity's facilities (for example, by producing a video program and marketing it to cable or broadcast operators). *See Chesapeake & Potomac Tel. Co. v. United States,* 830 F.Supp. 909, 922–23 & n. 19 (E.D.Va.1993). Plaintiffs argue that § 533(b) nonetheless places impermissible restrictions on speech by preventing them from providing cable television to their own customers along their own networks.

Congress made no findings of fact at the time it enacted § 533(b), which left little in the way of legislative history. *US West,* 855 F.Supp. at 1187. A House of Representatives committee report stated that § 533 "establishes clearly-defined cross-ownership rules and standards to prevent the development of local media monopolies and to encourage a diversity of ownership of communications outlets." *Id.* (quoting H.R.Rep. No. 934, 98th Cong., 2d Sess. 55 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4692).

As the Government points out in its brief, Congress and the FCC began to rethink § 533(b)'s cross-ownership ban by the late 1980s and early 1990s. *See* Defendants' Memorandum in Support of Their Motion, and in Opposition to the Plaintiffs' Motion, for Summary Judgment ("Defendants' Memorandum"), at 11. Several legislative attempts to repeal § 533(b) at that time failed, while the FCC embarked on a five-year rulemaking process that culminated in 1992, when the FCC formally reversed course and recommended § 533(b)'s repeal. The agency stated that although the 1970 FCC rule and its statutory successor had given cable television operators "an opportunity to firmly establish themselves as viable competitors," the cable industry's "enormous growth" since then had "attenuated" the once-feared risks of anticompetitive behavior by the telephone companies. *FCC Video Dialtone Order,* 7 FCC Rcd. at 5848.

The Government does not dispute that the FCC's 1992 decision came amid growing concern about monopolistic practices within the cable television industry. According to the undisputed evidence submitted by plaintiffs on the pending summary judgment motion, "[c]able television systems generally operate as monopolies in the local markets they serve." Plaintiff's Motion for Summary Judgment, Exh. A (Affidavit of Thomas W. Hazlett) at ¶ 3. Only about two percent of American households have a choice among cable systems, and the national level of subscribership of "wireless cable" service received by microwave dishes is estimated to be only one percent of cable viewership. *Id.*

In enacting the Cable Television Consumer Protection and Competition Act of 1992 ("the 1992 Cable Act") over a presidential veto, Congress made similar findings of fact:

> For a variety of reasons, including local franchising requirements and the extraordinary expense of constructing more than one cable television system to serve a particular geographic area, most cable television subscribers have no opportunity to select between competing cable systems. Without the presence of another multichannel video programming distributor, a cable system faces no local competition. The result is undue market power for the cable operator as compared to that of consumers and video programmers [persons or organizations which produce and market video programs for consumption by the viewing public].

> \* \* \* \* \* \*

> The cable industry has become highly concentrated. The potential effects of such concentration are barriers to entry for new programmers and a reduction in the number of media voices available to consumers.

> \* \* \* \* \* \*

> The cable industry has become vertically integrated; cable operators and cable programmers often have common ownership. As a result, cable operators have the incentive and ability to favor their affiliated programmers. This could make it more difficult for noncable-affiliated programmers to secure carriage on cable systems. Vertically integrated program suppliers also have the incentive and ability to favor their affiliated cable operators and programming distributors using other technologies.

> \* \* \* \* \* \*

> There is a substantial governmental and First Amendment interest in promoting a diversity of views provided through multiple technology media.

**2.** In one widely reported incident that seemed to illustrate the effects of cable monopolies, an executive of one of the nation's largest cable operators penned an internal memorandum telling managers to compensate for the 1992 Cable Act's impending rate regulations by increasing the charges for ancillary services and installation.

47 U.S.C. § 521 (Historical and Statutory Notes), Pub.L. No. 102–385, §§ 2(a)(2), 2(a)(4–6), 106 Stat. 1460 (1992). The 1992 Cable Act attempted to address these concerns by prohibiting exclusive local franchises, regulating or limiting the rates cable providers may charge consumers [2] and unaffiliated programmers, and prohibiting cable providers from owning "wireless" cable systems. *See* 47 U.S.C. §§ 532(c), 533(a)(2), 533(f), 543.

Yet the 1992 Cable Act did not repeal § 533(b) or otherwise open the cable market to telephone companies. The Government draws the court's attention to a congressional committee report two years earlier, when a predecessor bill died in the United States Senate. That 1990 report by the Senate Committee on Commerce, Science and Transportation stated that the committee could not support repeal of § 533(b) "because of concerns about the potential for anticompetitive practices by telephone companies and the need to ensure media diversity...." S.Rep. No. 456, 101st Cong., 2d Sess. 9 (1990). Those concerns, which led to the FCC's initial 1970 rule against telephone company provision of video programming, can be summarized as falling into two categories: cross-subsidization and network discrimination. *See FCC Video Dialtone Order*, 7 FCC Rcd. at 5848. Cross-subsidization is a practice in which telephone companies would abuse their monopoly position in the local telephone service market to subsidize cable service and undercut the competition. Network discrimination is a practice in which the telephone companies would use their control over poles and conduits to discriminate against independent cable operators or video programmers, thereby placing them at a competitive disadvantage. *Id.*

While Congress was in the process of enacting the 1992 Cable Act, the FCC and the Department of Justice ("DOJ") were publicly stating that the concerns about cross-subsidi-

"We cannot be disuaded [sic] from the charges simply because customers object," the memo stated. "It will take a while, but they'll get used to it." *See* Paul Farhi, *TCI Memo Called for Price Hikes*, The Washington Post, Nov. 16, 1993, at C1.

zation and network discrimination could be addressed adequately by federal regulations and that allowing telephone companies into the cable market actually would enhance competition. With regard to cross-subsidization, the FCC stated that its existing cost-allocation and accounting rules governing the nonregulated affairs of telephone companies "constitute an effective means of preventing cross-subsidization between regulated and nonregulated services." *FCC Video Dialtone Order,* 7 FCC Rcd. at 5829. The FCC also observed that cable operators already occupy a "leading position" in the market and that "[g]iven this widely changed competitive situation, we find it reasonable to conclude that, with appropriate safeguards on their entry, there is little threat that the local telephone companies could preemptively eliminate competition and monopolize the market for video programming services." *Id.* at 5848–49. The DOJ has recognized that as long as telephone companies have a monopoly over phone service, they "will continue to have incentives, and the ability, to cross-subsidize and discriminate." Plaintiff's Motion for Summary Judgment Motion, App. Tab 10 (Congressional Testimony of DOJ Assistant Attorney General Anne K. Bingaman, hereinafter "Bingaman Testimony"), at 8. But the DOJ also stated during an FCC rulemaking proceeding that the "procompetitive benefits" of allowing telephone companies to provide video programming outweigh "any anticompetitive risks involved." *Id.,* App. Tab 6 (DOJ Cross–Ownership Rules Reply), at 44.

> [S]ince the cable industry is already vertically integrated, it is unlikely that allowing the telephone companies to vertically integrate will have anticompetitive effects. It will just make them more effective competitors, and will create an alternative player with whom third parties can bargain to carry their programming.

*Id.* at 45. The DOJ went so far as to say it "disagrees" with those who argue that permitting telephone companies into the cable business would hamper competition by allowing them to engage in anticompetitive behavior. *Id.* at 46 n. 50. In another footnote, the DOJ explained why its position was not inconsistent with its earlier support for the cross-ownership ban,[3] citing 1982 DOJ comments before the FCC in which the DOJ noted that where "the rationales for such restrictions are no longer valid, they should be removed or, at least modified, to permit the marketplace to function freely." *Id.* at 44 n. 44.

This past year, Congress continued its review of telecommunications law and policy. But a legislative proposal to repeal § 533(b) stalled, amid some degree of pessimism as to whether Congress will ever overhaul the federal telecommunications laws.[4] Unwilling to wait for the legislative wrangling to result in repeal, telephone companies such as plaintiffs have turned to the federal courts for relief, challenging the constitutionality of § 533(b) on First Amendment grounds. So far, each of the district courts that have considered the question has ruled that § 533(b) violates the First Amendment. *See BellSouth Corp. v. United States,* 868 F.Supp. 1335, 1344 (N.D.Ala.1994); *US West, Inc. v. United States,* 855 F.Supp. 1184, 1193 (W.D.Wash. 1994); *Chesapeake & Potomac Tel. Co. v. United States,* 830 F.Supp. 909, 931–32 (E.D.Va.1993) ("*C & P*"). In each of those cases and in this case, the Government takes the position that § 533(b) is constitutional because it furthers the Government's legitimate interest in preventing anticompetitive behavior by the telephone companies, even though it burdens protected speech. Therefore the Government places itself in the somewhat awkward position of defending the statute on grounds it recently dismissed as

---

**3.** Although § 533(b) has been referred to as a "cross-ownership" rule, the court agrees with plaintiffs that the term "cross-ownership" understates the case somewhat, in that the statute actually prohibits plaintiffs from engaging in a particular manner of speech—the provision of video programming directly to customers in plaintiffs' service areas.

**4.** *See* Edmund L. Andrews, *Bill to Revamp Communications Dies in Congress,* N.Y. Times, Sept. 24, 1994, at A1 ("Despite numerous efforts over the last decade, Congress had never come as close as it did this year to passing a broad communications bill. Reassembling the necessary coalitions and restitching the necessary compromises next year would be difficult at best.")

no longer having any force. In any event the Government's litigation of the constitutional issues in this case is not inconsistent with its stated goal of moving telecommunications policy "out of the courts and into the statute books so that Congress, representing the public, can establish the far-reaching and comprehensive framework for governing the telecommunications world of the future that the nation deserves." Bingaman Testimony at 3.

Plaintiffs, however, ask this court to intervene to protect their First Amendment rights where Congress has failed or declined to adapt telecommunications law to changing technological and economic circumstances. Plaintiff Ameritech is the parent corporation of plaintiffs Illinois Bell and Michigan Bell, which desire to provide cable television service, through affiliates, to customers in their service areas. Plaintiffs have couched their complaint as a facial constitutional challenge to § 533(b), and also as a challenge to the statute as it applies to bar specific cable television ventures plaintiffs allege they would launch, through subsidiaries, in Naperville, Illinois, and Troy, Michigan. Plaintiff-intervenor CCI is a holding company whose subsidiaries include plaintiff-intervenor ICTC, a telephone company that serves 18 Illinois counties. CCI also alleges that it desires to offer cable television service, through a subsidiary, to customers in ICTC's service area. Section § 533(b) specifically prohibits entities such as Ameritech, the Bell companies, and other telephone companies such as CCI or ICTC (collectively "plaintiffs") from doing any of these things. Plaintiffs essentially contend that although the statute may have served the Government's asserted interests ten years ago, it no longer does and thus should be held to violate the First Amendment.

### ANALYSIS

■ Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,*

477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A "genuine issue of material fact exists only where 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Dribeck Importers, Inc. v. G. Heileman Brewing Co.,* 883 F.2d 569, 573 (7th Cir.1989) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986)). This case is particularly appropriate for summary judgment because the facts are not in dispute; the parties differ only on the legal question of whether § 533(b) unconstitutionally restricts plaintiffs' free speech rights under the First Amendment.

### I. *Section 533(b) Restricts Plaintiffs' Speech.*

The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech, or of the press...." U.S. Const. amend I. The Supreme Court has held that cable programmers and operators "engage in and transmit speech, and they are entitled to the protection of the speech and press provisions of the First Amendment." *Turner Broadcasting Sys., Inc. v. FCC,* —— U.S. ——, ——, 114 S.Ct. 2445, 2456, 129 L.Ed.2d 497 (1994) (citing *Leathers v. Medlock,* 499 U.S. 439, 444, 111 S.Ct. 1438, 1442, 113 L.Ed.2d 494 (1991)); *see also City of Los Angeles v. Preferred Communications, Inc.,* 476 U.S. 488, 494, 106 S.Ct. 2034, 2037–38, 90 L.Ed.2d 480 (1986) (holding that where municipality had refused to lease utility pole space to respondent cable company, "the activities in which respondent allegedly seeks to engage plainly implicate First Amendment interests"). In light of this case law, the Government does not dispute that by prohibiting plaintiff telephone companies from providing video programming to consumers within plaintiffs' service areas, § 533(b) actually restricts the plaintiffs' speech. The parties instead dispute the level of scrutiny that should be applied to § 533(b) and the outcome of the case once the appropriate level of scrutiny is applied.

Courts have applied three levels of scrutiny to statutes or other restrictions that bur-

den speech protected by the First Amendment:

■ (1) In an analysis akin to "rational basis" scrutiny, courts uphold regulations affecting broadcast television if the regulations are "a reasonable means" of promoting a "permissible" public interest, such as the interest in diversified mass communications. *FCC v. National Citizens Comm. for Broadcasting,* 436 U.S. 775, 796, 802, 98 S.Ct. 2096, 2112–13, 2115–16, 56 L.Ed.2d 697 (1978) (*"NCCB"*). This is the least rigorous degree of scrutiny.

■ (2) Courts apply "intermediate" or "heightened" scrutiny to regulations or restrictions on speech-related conduct or on the time, place or manner of speech. When governmental regulation of conduct has an incidental effect on speech, the regulation will be upheld (1) if it is within the constitutional power of the Government; (2) if it furthers an important or substantial governmental interest; (3) if the governmental interest is unrelated to the suppression of free expression; and (4) if the burden on speech is no greater than is essential to the furtherance of the governmental interest. *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). Likewise, governmental restrictions on the time, place and manner of speech are valid so long as (1) they are content-neutral; (2) they are narrowly tailored to serve a significant governmental interest; and (3) they leave open ample alternative channels for communication of the information. *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2753–54, 105 L.Ed.2d 661 (1989); *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984); *Graff v. City of Chicago,* 9 F.3d 1309, 1319 (7th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1837, 128 L.Ed.2d 464 (1994). The *O'Brien* test is "little, if any, different" from the *Ward* test. *Ward,* 491 U.S. at 798, 109 S.Ct. at 2757.

■ (3) A restriction that burdens speech according to its content, or that affects so small a group of speakers as to be directed at the content of their speech, is presumptively invalid and will be upheld only if it is "necessary to serve a compelling state interest." *R.A.V. v. City of St. Paul,* 505 U.S. —, —, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305 (1992). This level of scrutiny, known as "strict scrutiny," is the most stringent.

The Government argues for the least rigorous level of scrutiny, under which § 533(b) obviously would have the greatest chance of being upheld. Plaintiffs argue that § 533(b) is content-based and should be subject to strict scrutiny, but that the statute is unconstitutional even when intermediate scrutiny is applied. In Part II of this opinion, the court discusses rational basis and strict scrutiny before concluding that intermediate scrutiny is the appropriate test for § 533(b).

## II. *Intermediate Scrutiny Should Be Applied to § 533(b).*

### A. The Supreme Court's Lower Level of Scrutiny in Broadcast Regulation Cases Does Not Apply.

■ As a preliminary matter, this court does not accept the Government's argument in favor of the least stringent level of scrutiny, a form of "rational basis" review which the Supreme Court has employed in cases involving the regulation of over-the-air broadcasting. *See NCCB,* 436 U.S. at 798–802, 98 S.Ct. at 2114–16. In *NCCB,* the Court rejected a First Amendment challenge to an FCC rule barring newspapers from owning broadcast stations in the same community, reasoning that the rule was content-neutral and served as a reasonable means of promoting a "permissible" government interest—the diversification of ownership in the mass communications media as a whole. *Id.* The Government urges this court to apply *NCCB* to § 533(b), despite the Supreme Court's recent pronouncement that *NCCB* and other "broadcast cases"[5] do not apply to regulation of cable television. *See Turner*

---

5. *E.g., FCC v. League of Women Voters,* 468 U.S. 364, 377, 104 S.Ct. 3106, 3116, 82 L.Ed.2d 278 (1984); *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 388–89, 89 S.Ct. 1794, 1805–06, 23 L.Ed.2d 371 (1969); *National Broadcasting Co. v. United States,* 319 U.S. 190, 226, 63 S.Ct. 997, 1014, 87 L.Ed. 1344 (1943).

*Broadcasting,* —— U.S. at ——––——, 114 S.Ct. at 2456–57.

In *Turner Broadcasting,* the Court upheld the constitutionality of the 1992 Cable Act's "must-carry" provisions, which require cable operators to carry local commercial and non-commercial television stations on their cable systems. Rejecting the Government's argument for the form of rational-basis review articulated in *NCCB, Turner Broadcasting* employed intermediate scrutiny, refusing to apply *NCCB* and other cases involving over-the-air broadcasting to a situation involving cable television. *Id.* The Court described the rational basis standard of the broadcast regulation cases as a "distinct approach" that "rests upon the unique physical limitations of the broadcast medium." *Id.,* —— U.S. at ——, 114 S.Ct. at 2456. Over-the-air broadcasting allows room for a limited number of speakers, so the rationale of cases such as *NCCB* rests on the notion that the Government should be given more leeway to regulate broadcast communications so that a few speakers do not gain a disproportionate hold over the medium as a whole. *See NCCB,* 436 U.S. at 799, 802, 98 S.Ct. at 2114, 2115–16 ("In light of this physical scarcity, Government allocation and regulation of broadcast frequencies are essential, as we have often recognized.... Being forced to choose among applicants for the same facilities, the Commission has chosen on a sensible basis, one designed to further, rather than contravene, the system of freedom of expression.") (internal quotation marks omitted). But that is not the case with cable, in which technological advances have brought about the prospect of having "no practical limitation on the number of speakers who may use the cable medium." *Turner Broadcasting,* —— U.S. at ——, 114 S.Ct. at 2457.

In the wake of *Turner Broadcasting,* the Government argues that *NCCB* should still apply to § 533(b)'s "cross-ownership" ban (prohibiting telephone companies from providing cable in their service areas and from owning or operating an affiliate that would do the same) because "the scarcity rationale is not necessary to sustain a cross-ownership rule," given that *NCCB* upheld such a rule as applied to newspapers, which, like cable, do not labor under the inherent physical limitations of broadcasting. Supplemental Memorandum in Support of Defendants' Motion for Summary Judgment ("Defendants' Supplemental Memorandum"), at 2 n. 1. But the *NCCB* Court upheld restrictions on newspaper activities only as they concerned newspapers' entry into the broadcast market, and not their activities as newspapers. Moreover, the Supreme Court in *Turner Broadcasting* flatly repudiated the Government's argument, saying in effect that the "scarcity rationale" formed the very basis of the standard applied in the *NCCB* line of cases: "[T]he special physical characteristics of broadcast transmission, and not the economic characteristics of the broadcast market, are what underlies our broadcast jurisprudence." *Turner Broadcasting,* —— U.S. at ——, 114 S.Ct. at 2457. So although the scarcity rationale may or may not be necessary to sustain a cross-ownership rule, it is a necessary prerequisite to application of rational-basis scrutiny as articulated in *NCCB.*

To say that scarcity is not such a prerequisite is to say that some other rationale supports the lower level of scrutiny applied in *NCCB.* The Government makes precisely this suggestion by citing to a footnote in which the *NCCB* Court referred to its past decisions holding that the applicability of the antitrust laws to newspapers is consistent with the First Amendment. *See NCCB,* 436 U.S. at 800 n. 18, 98 S.Ct. at 2115 n. 18. Although that same footnote stated that the FCC's ban on newspaper ownership of television stations in *NCCB* was based on "First Amendment rather than antitrust considerations," *id.,* the Government appears [6] to be suggesting that a market economic or antitrust rationale, one not related to the scarcity of broadcast frequencies, explains the broad-

---

6. The court uses the word "appears" because the Government, in its supplemental brief filed after *Turner Broadcasting* was decided, does not elaborate on what rationale other than scarcity supported the result in *NCCB. See* Defendants' Supplemental Memorandum at 2 n. 1. But in its initial brief, which was filed before *Turner Broadcasting,* the Government referred to the restrictions in broadcast cases generally as "structural regulations" ostensibly aimed at preventing the "unhealthy concentration of economic power" in the media. Defendants' Memorandum at 20.

cast cases and thus supports their extension to cable television, where the scarcity rationale does not apply. In this respect, the scarcity rationale may be analogous to the theory behind § 533(b), which purports to promote competitiveness and a diversity of ownership in the cable television industry by preventing the telephone companies from monopolizing it. Even if cable television does not suffer from the same physical limitations of broadcasting, it might be susceptible to market forces—such as monopolization—that could bring about the same undesirable results. But as the Supreme Court made clear in *Turner Broadcasting,* such a "market dysfunction" rationale was *not* at the root of the broadcast regulation cases that the Government would like this court to apply to § 533(b). *Turner Broadcasting,* — U.S. at ——, 114 S.Ct. at 2457. The Court in *Turner Broadcasting* specifically refused to extend *NCCB* and the other broadcast cases to cable television, despite the Court's acknowledgment that "the cable market is beset by a similar dysfunction" as that which characterizes the broadcast market. *Id.* —— U.S. at ————, 114 S.Ct. at 2457–58. "[T]he mere assertion of dysfunction or failure in a speech market, without more, is not sufficient to shield a speech regulation from the First Amendment standards applicable to nonbroadcast media." *Id.* —— U.S. at ——, 114 S.Ct. at 2458.

Moreover, the Court in *Turner Broadcasting* added that where a law imposes "special obligations" or "special burdens" upon cable programmers, "some measure of heightened First Amendment scrutiny is demanded." *Id.* —— U.S. at ——, 114 S.Ct. at 2458. Just as the 1992 Cable Act's "must-carry" provisions placed a special burden on cable programmers, so does § 533(b) place a special burden on telephone companies by prohibiting them from directly providing video programming to their customers. Accordingly, the *NCCB* or "rational basis" standard of review does not apply to § 533(b). *See Bell-South,* 868 F.Supp. at 1338–39; *US West,* 855 F.Supp. at 1190; *C & P,* 830 F.Supp. at 918–22.

## B. Strict Scrutiny Does Not Apply.

▇▇▇ Plaintiffs argue that § 533(b) should be subject to strict scrutiny, under which a restriction is invalid unless it is "necessary to serve a compelling state interest" and is "narrowly drawn to achieve that end." *See R.A.V. v. City of St. Paul,* 505 U.S. ——, ——, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305 (1992). Strict scrutiny under the First Amendment generally is triggered when a law is content-based, in that it distinguishes favored from unfavored speech on the basis of the ideas or views expressed. *Turner Broadcasting,* — U.S. at ——, 114 S.Ct. at 2459. A law, restriction or tax also may be subject to strict scrutiny if it targets so small a group of speakers that it threatens to censor particular ideas or viewpoints. *See Leathers v. Medlock,* 499 U.S. 439, 451–52, 111 S.Ct. 1438, 1446–47, 113 L.Ed.2d 494 (1991). Plaintiffs contend that § 533(b) is subject to strict scrutiny because it is content-based and because it discriminates against telephone companies as a discrete group of speakers.

### 1. Section § 533(b) Is Content–Neutral.

The core of plaintiffs' argument that § 533(b) is content-based rests with the statute's means of defining what constitutes "video programming," which the statute specifically forbids plaintiffs from providing directly to customers in their service areas. Plaintiffs focus on the FCC's interpretation that "video programming," as stated in § 533(b) and defined in § 522(19), means "programming comparable to that provided by broadcast television stations in 1984." *FCC Video Dialtone Order,* 7 FCC Rcd. at 5820. Plaintiffs argue that if a telephone company were to provide a video image directly to its customers, the FCC's comparison of that video image with broadcast television programming as it existed in 1984 would constitute a content-based determination of whether the image is being provided in violation of the statute. Furthermore, plaintiffs argue that § 533(b) draws a content-based distinction by banning plaintiffs from directly providing "video programming" while allowing them to provide certain video and information services (such as two-way interactive shopping

services and video telephone service). This argument persuaded the district court in *C & P*, which concluded that although § 533(b) appeared to be content-based, strict scrutiny could not be applied to the statute in light of the Supreme Court's decision in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). *C & P*, 830 F.Supp. at 924–26; *see also BellSouth*, 868 F.Supp. at 1339–40 (following *C & P*). In *Renton*, the court upheld zoning restrictions affecting pornographic businesses, where the justification for the restrictions was "unrelated to the suppression of free expression" and was a means of preventing "secondary effects" such as crime and neighborhood deterioration. *Renton*, 475 U.S. at 48, 106 S.Ct. at 929.

This court parts company here with the analysis in *C & P*, which referred to the FCC's discussion in the Video Dialtone Order and concluded that the FCC's attempt to distinguish "video programming" from the transmission of other video images was unclear at best:

> Apparently, the Commission will allow telephone companies to transmit presentations that are primarily textual, and include some video segments, but will prohibit presentations that are primarily video, and include some textual segments. Irrespective of whether this is a workable line of demarcation, the example is noteworthy because it shows that the Commission's interpretation is inescapably premised on the content of the relevant transmission.

*C & P*, 830 F.Supp. at 923–24. However, the FCC interpretation noted that the key characteristic of video programming in 1984 was that it was "one-way." *FCC Video Dialtone Order*, 7 FCC Rcd. at 5821. The viewer had no ability to interact with or manipulate the image. "Two-way" or "interactive" programming, however, allowed the viewer to "tailor the video images to his or her specific requests." *Id.* The FCC deemed the "interactive" video to be something other than video programming, because it was not comparable to "one-way" programming provided by broadcast television stations in 1984. *Id.* The FCC also added the caveat that some

elements of "interactive" programming might be deemed video programming if those elements could be separated from the interactive package and provided independently as programming comparable to television programming in 1984. *Id.*

▪ In determining whether this distinction is content-based, the court must determine whether it favors some speech over other speech on the basis of the ideas or views expressed. *Turner Broadcasting*, ––– U.S. at –––, 114 S.Ct. at 2459; *see also Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 2753–54, 105 L.Ed.2d 661 (1989) ("The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys."). In that vein, the court does not see how ideas or views fit into the distinction between interactive programming and traditional video programming. There can be no doubt that interactive programming is a form of communication or mode of expression of ideas, but as such it differs from noninteractive video only in the form or manner of speech, rather than in substance. For example, if a local government told people they could not shout messages through a bullhorn in residential neighborhoods but could broadcast them on the radio or television, this rule would not be a content-based restriction, even though it distinguishes among modes of communication. But if our hypothetical local government told people they could not read John Steinbeck or Nelson Algren novels aloud over the megaphone, but could convey any other message, this would be a content-based distinction subject to strict scrutiny. "Thus, a prohibition against the use of sound trucks emitting 'loud and raucous' noise in residential neighborhoods is permissible if it applies equally to music, political speech, and advertising." *City of Cincinnati v. Discovery Network, Inc.*, ––– U.S. –––, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). In *Discovery Network*, a city banned commercial publications, but not noncommercial publications, from using sidewalk newsracks. The Court held that the ban was content-based, and that *Renton* did not apply because the secondary effects of

commercial newsracks were no different from those of noncommercial newsracks. *Id.* —— U.S. at ——, 113 S.Ct. at 1517.

This case would be like *Discovery Network* if, for example, § 533(b) allowed telephone companies to provide educational video programming but not entertainment video programming. But the statute instead prevents telephone companies from directly providing any video programming, no matter what the content. The court also does not believe that the FCC interpretation of § 533(b) requires the agency, in defining "video programming," to compare the ideas or views of a telephone company's video transmissions with, as the *C & P* court put it, "what's on television in 1984." *See C & P,* 830 F.Supp. at 923 n. 22.

This court reaches the same result as *C & P* and *BellSouth,* but for a different reason. Section 533(b) does not distinguish favored speech from unfavored speech on the basis of the ideas or views expressed, and for that reason it is not subject to strict scrutiny. *See Turner Broadcasting,* —— U.S. at —— ——, 114 S.Ct. at 2459–60.

### 2. Section § 533(b)'s Distinction Among Speakers Does Not Warrant Strict Scrutiny.

■ Plaintiffs contend that by targeting telephone companies, § 533(b) affects a small number of speakers and thus should be subject to strict scrutiny. But the Supreme Court's recent decisions on this subject establish that a differential burden on speakers in and of itself does not implicate the First Amendment, unless the distinction "is directed at, or presents the danger of suppressing, particular ideas." *Leathers v. Medlock,* 499 U.S. 439, 452–53, 111 S.Ct. 1438, 1446–47, 113 L.Ed.2d 494 (1991). In *Leathers,* the Court rejected a First Amendment challenge to a state tax on cable operators, where the tax was content-neutral and did not suggest an attempt to censor the cable operators or "stifle the free exchange of ideas." *Id.* at 453, 111 S.Ct. at 1447. Similarly, in *Turner Broadcasting,* the Court noted that the 1992 Cable Act's "must-carry" provisions favored

broadcasters and disfavored cable operators but did so "based only upon the manner in which speakers transmit their messages to viewers, and not only the messages they carry. . . . So long as they are not a subtle means of exercising a content preference, speaker distinctions of this nature are not presumed invalid under the First Amendment." *Turner Broadcasting,* —— U.S. at —— —— ——, 114 S.Ct. at 2460–61. In this case, § 533(b) favors cable operators and disfavors telephone companies by not allowing the latter to provide video programming directly to customers in their service areas. But as observed in Part II(B)(1) of this opinion, the statute is not based on any content preference and concerns only the manner of speech. Therefore the fact that it targets telephone companies is by itself insufficient to trigger strict scrutiny under cases such as *Leathers* and *Turner Broadcasting.*[7]

### C. Section 533(b) Must Be Reviewed Under Intermediate Scrutiny.

■ Content-neutral restrictions on speech-related conduct or on the time, place or manner of speech are subject to intermediate scrutiny. *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968); *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2753–54, 105 L.Ed.2d 661 (1989); *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984). Under intermediate scrutiny, the restriction may be upheld if (1) it is content-neutral; (2) it is narrowly tailored to serve a significant governmental interest; and (3) it leaves open ample alternative channels for communication of the information. *Id.* 491 U.S. at 791, 109 S.Ct. at 2753–54; *Clark,* 468 U.S. at 293, 104 S.Ct. at 3069. When applied to governmental regulations on speech, intermediate scrutiny requires the Government to demonstrate that its asserted interests are real and that the restriction on speech will further those interests in a "direct and material way." *See Edenfield v. Fane,* —— U.S. ——, ——, 113 S.Ct. 1792, 1800, 123 L.Ed.2d 543

---

**7.** Even if strict scrutiny did apply, the result in this case would be the same because of the Government's failure to satisfy even the standard

of intermediate scrutiny, discussed later in this opinion. *See US West,* 855 F.Supp. at 1191.

(1993) (applying intermediate scrutiny to strike down a state's ban on solicitation of business by accountants).

Although the three-part intermediate scrutiny test as stated in *Ward* and *Clark* is somewhat different from the four-pronged version first articulated in *O'Brien,* the Supreme Court considers the two tests to be roughly the same. *Ward,* 491 U.S. at 798, 109 S.Ct. at 2757. Section 533(b) also is more in the nature of a restriction on the manner of speech and thus fits neatly into the more recent formulation stated in *Ward. Accord BellSouth,* 868 F.Supp. at 1340; *US West,* 855 F.Supp. at 1190–91; *C & P,* 830 F.Supp. at 926. Under the *Ward* test, after determining that § 533(b) is content-neutral, the court must next determine whether the statute is narrowly tailored to serve a significant government interest. *Ward,* 491 U.S. at 791, 109 S.Ct. at 2753–54.

### III. *Section 533(b) Is Not Narrowly Tailored To Serve the Government's Significant Interest in Preventing Anticompetitive Behavior in the Cable Television Industry.*

■■■ Plaintiffs do not dispute that the Government has a significant interest in promoting competitiveness and diversity of ownership in the cable television industry, including services related to the provision of video programming to consumers in their homes. The dispute concerns whether § 533(b) is narrowly tailored to serve that interest. "Narrow tailoring" requires only that the regulation promote a substantial government interest that would be achieved less effectively without the regulation. *Turner Broadcasting,* —— U.S. at ——, 114 S.Ct. at 2469; *Ward,* 491 U.S. at 799, 109 S.Ct. at 2758. "To be sure, this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward,* 491 U.S. at 799, 109 S.Ct. at 2758. So although the means of advancing the governmental interest need not be the least speech-

restrictive means, they may not be more speech-restrictive than is necessary. *Id.* at 799–800, 109 S.Ct. at 2758–59.

■■■ It may be that § 533(b) would have passed constitutional muster at the time it was enacted in 1984, and earlier. But the business of cable television and of video programming in general has seen rapid technological and economic change in the past ten years. When a statute's constitutionality is predicated on a particular state of facts, that constitutionality "may be challenged by showing to the court that those facts have ceased to exist." *United States v. Carolene Prods. Co.,* 304 U.S. 144, 153, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938) (citing *Chastleton Corp. v. Sinclair,* 264 U.S. 543, 44 S.Ct. 405, 68 L.Ed. 841 (1924)); *see also Nashville, Chattanooga & St. Louis Ry. v. Walters,* 294 U.S. 405, 415, 55 S.Ct. 486, 488, 79 L.Ed. 949 (1935) ("A statute valid when enacted may become invalid by change in the conditions to which it is applied."). Section 533(b) must be analyzed with reference to conditions as they exist today. *Cf. United States v. Western Elec. Co.,* 900 F.2d 283, 309 (D.C.Cir.) ("the district court should determine whether removal of the information-services restriction [in the AT & T consent decree] as applied to the generation of information would be anticompetitive under *present* market conditions") (emphasis in original), *cert. denied,* 498 U.S. 911, 111 S.Ct. 283, 112 L.Ed.2d 238 (1990). If, under present conditions, the statute places a greater burden on speech than is necessary to promote the goals of competitiveness and diversity of ownership in the business of cable television or video programming, the statute is not "narrowly tailored" to promote those goals.

■■■ As the Government correctly points out, federal courts should not second-guess the Government's reasonable determination of how much regulation is needed and how that level of regulation is to be achieved. *Ward,* 491 U.S. at 800, 109 S.Ct. at 2758–59; *Clark,* 468 U.S. at 299, 104 S.Ct. at 3072. But this case presents a significant challenge of ascertaining what determinations the Government has made regarding those issues. The FCC and DOJ have taken the position that § 533(b) actually impedes competition,

that competition would be fostered by the statute's repeal, and that concerns about cross-subsidization and network discrimination could be addressed by federal regulations. *FCC Video Dialtone Order,* 7 FCC Rcd. at 5829, 5848–49; DOJ Cross-Ownership Rules Reply at 44–46. In this litigation, the Government states that "the defendant agencies stand by their assessment." Defendants' Memorandum at 30. Nonetheless, the Government contends that despite the firm foothold the cable television industry has developed in the past ten years, Congress can and did reach the reasonable conclusion—when it declined to repeal § 533(b) in 1992—that § 533(b) remains the most effective means of preventing telephone companies from monopolizing cable television through cross-subsidization, predatory pricing and network discrimination. If that is so, according to the Government, it does not matter that the Government itself has recently disagreed. The Government further argues that because this particular field of regulation is highly complex and fact-bound, the court should defer to Congress.

However, the court does not accept that Congress made any clear determination as to whether § 533(b) continues to serve the ends for which it was enacted. Although it is true that Congress, prior to enacting the 1992 Cable Act, did hear voluminous testimony from proponents and opponents of § 533(b)'s repeal, the Supreme Court teaches that "failed legislative proposals are 'a particularly dangerous ground on which to rest an interpretation of a prior statute.'" *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* — U.S. —, —, 114 S.Ct. 1439, 1453, 128 L.Ed.2d 119 (1994) (quoting *Pension Benefit Guar. Corp. v. LTV Corp.,* 496 U.S. 633, 650, 110 S.Ct. 2668, 2678, 110 L.Ed.2d 579 (1990)). Congress made no findings of fact at the time it enacted § 533(b), and the fact that Congress did not repeal § 533(b) in 1992 or in 1994 does not translate into a finding that the statute continues to promote competition and diversity in cable television, whatever statements may have appeared in the legislative history of the 1992 Cable Act or of predecessor bills

that did not become law. *See BellSouth,* 868 F.Supp. at 1344 n. 13. Moreover, even if there were such legislative findings of fact, they would not relieve the court of its duty to decide independently whether § 533(b) violates the Constitution by burdening more speech than is necessary to achieve the statute's goals. *See Sable Communications of California, Inc. v. FCC,* 492 U.S. 115, 129, 109 S.Ct. 2829, 2838, 106 L.Ed.2d 93 (1989).

The Government also cites two reports of the General Accounting Office and several judicial opinions for the proposition that anticompetitive behavior by the telephone companies remains a significant concern. *See* Defendants' Memorandum at 31. For example, the Ninth Circuit observed that because enhanced competitiveness in the information service markets into which the telephone companies ("BOCs") wished to enter "does nothing" to decrease their monopoly power in the local telephone market, "we fail to see how it can diminish the BOCs' ability to shift costs to their regulated services without detection in ratemaking proceedings." *California v. FCC,* 905 F.2d 1217, 1234 (9th Cir. 1990); *see also United States v. Western Elec. Co.,* 673 F.Supp. 525, 567–79 (D.D.C. 1987) (refusing initially to lift portion of AT & T consent decree concerning ban on telephone company provision of information services, and finding that federal regulatory scheme would not prevent cross-subsidization and network discrimination), *aff'd in part and rev'd in part,* 900 F.2d 283, 309 (D.C.Cir.) (remanding with instructions to consider whether lifting the ban would be anticompetitive under then-present market conditions), *cert. denied,* 498 U.S. 911, 111 S.Ct. 283, 112 L.Ed.2d 238 (1990), *on remand,* 767 F.Supp. 308, 327 (D.D.C.1990) (lifting the ban "with considerable reluctance" but in deference to DOJ's view that doing so would not be anticompetitive), *aff'd,* 993 F.2d 1572 (D.C.Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 487, 126 L.Ed.2d 438 (1993). Conceding arguendo that the telephone companies may retain the incentive and ability to cross-subsidize and discriminate on their networks,[8] the key issue in this

8. As to the question of network discrimination,

the court concurs with the *C & P* court's conclu-

litigation is whether § 533(b), in attempting to address those concerns, places a greater than necessary burden on protected speech. In other words, to sustain the statute, the Government must show that less restrictive measures [9] would not be effective in restraining the monopolistic tendencies of the telephone companies. The undisputed facts are that the FCC and DOJ, the two federal agencies responsible for formulating executive branch policy on telecommunications and antitrust matters, agree that § 533(b) *does not* promote competition and diversity in cable television, and that the statute may actually hinder the achievement of those objectives. The Government characterizes these propositions as debatable, and that they may be. But they must be more than debatable to sustain the Government's burden of showing that § 533(b) is narrowly tailored to promote competition and diversity of ownership in cable television. As in *US West*, "there is no convincing evidence in the record that other current methods of regulating anticompetitive behavior would be ineffective." *US West*, 855 F.Supp. at 1193; *see also Bell-South*, 868 F.Supp. at 1343 ("the Government has not shown that less restrictive regulations would be ineffective"). For these reasons, this court holds that § 533(b) imposes a greater-than-necessary burden on plaintiffs' speech and therefore is not narrowly tailored to serve the Government's significant interest in preventing anticompetitive behavior and promoting diversity of ownership in the cable television industry. Even when all inferences are drawn in the Government's favor, there is no genuine issue of fact as to whether § 533(b) unconstitutionally burdens

substantially more speech than is necessary to serve the Government's interests, *see Ward,* 491 U.S. at 799, 109 S.Ct. at 2758, especially given the "widely changed competitive situation" in which the FCC has found that independent cable operators hold "a leading position" in the delivery of video programming and face "little threat" of monopolization by the telephone companies' entry into the market. *FCC Video Dialtone Order,* 7 FCC Rcd. at 5848–49.

So although § 533(b) is content-neutral, it does not meet the "narrow tailoring" requirement of intermediate scrutiny and cannot be justified as a legitimate time, place, or manner restriction on speech, regardless of whether or not it leaves open ample alternative channels of communication. *See Discovery Network,* —— U.S. at ——, 113 S.Ct. at 1517 (passing over the question of ample alternative channels where statute was neither content-neutral nor narrowly tailored). The fact is, however, that the statute does not leave open ample alternative channels of communication, despite the Government's argument that plaintiffs are free to provide video programming to customers outside their service areas or through independent media outlets. Plaintiffs concede that they could communicate through these channels, at great expense and inconvenience, but the court agrees with plaintiffs that the Government's reasoning here is akin to telling the Chicago Tribune that it may distribute a newspaper everywhere but in Chicago, or that its ability to communicate is not significantly curtailed by its having to publish its news stories in other publications. *See Southeastern Promotions, Ltd. v. Conrad,*

sion that Congress' enactment of the Pole Attachment Act, 47 U.S.C. § 224, adequately addresses concerns over pole and conduit access discrimination, or, alternatively, demonstrates that effective legislation could be passed to address those concerns. *C & P,* 830 F.Supp. at 929–30 n. 29. The Pole Attachment Act authorizes the FCC to "regulate the rates, terms, and conditions for pole attachments to provide that such rates, terms and conditions are just and reasonable," and to "adopt procedures necessary and appropriate to hear and resolve complaints concerning such rates, terms, and conditions." 47 U.S.C. § 224(b)(1). The FCC has promulgated a set of regulations governing pole attachment complaints. *See* 47 C.F.R. § 1.1401 *et seq.* Moreover, it is hard to view network discrimination as a significant problem when, according to the

FCC, cable operators already have their own networks which give access to more than 90 percent of American homes. *See FCC Video Dialtone Order,* 7 FCC Rcd. at 5848.

9. These measures could include cost accounting standards to detect cross-subsidization and a "complex regulatory framework designed to protect against discrimination and other anticompetitive conduct." *FCC Video Dialtone Order,* 7 FCC Rcd. at 5829–30. Other possible measures include an initial limit on the percentage of channel capacity that the telephone companies may use for their own programming, with the remainder to be leased to other programmers. *Id.* at 5850.

420 U.S. 546, 556, 95 S.Ct. 1239, 1245, 43 L.Ed.2d 448 (1975) (" '[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.' ") (quoting *Schneider v. State*, 308 U.S. 147, 163, 60 S.Ct. 146, 151–52, 84 L.Ed. 155 (1939)).

## CONCLUSION

For the foregoing reasons, the court grants the summary judgment motions of plaintiffs and intervenor-plaintiffs and denies the motion of defendants. Judgment will be entered on behalf of plaintiffs Ameritech Corporation, Illinois Bell Telephone Company, Michigan Bell Telephone Company, Consolidated Communications, Inc. and Illinois Consolidated Telephone Company. The court will issue a declaratory judgment to the effect that § 533(b) unconstitutionally infringes upon plaintiffs' First Amendment right of free speech. The court will also permanently enjoin defendants from enforcing § 533(b) against plaintiffs Ameritech Corporation, Illinois Bell Telephone Company, and Michigan Bell Telephone Company, and against the intervenor-plaintiffs Consolidated Communications, Inc. and Illinois Consolidated Telephone Company, in their respective service areas.