# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
May 4, 2005 Session

## US LEC OF TENNESSEE, INC. v. TENNESSEE REGULATORY AUTHORITY

**Appeal from the Tennessee Regulatory Authority**
**No. 02-00562      Sara Kyle, Chairman**

---

**No. M2004-01417-COA-R12-CV - Filed April 17, 2006**

---

This appeal involves a dispute between two telecommunications services providers in the Chattanooga market. A privately owned provider filed a complaint with the Tennessee Regulatory Authority asserting that a competing provider owned by a municipal electric utility was receiving an illegal cross-subsidy because the electric utility was permitting the provider to use its name without compensation. One of the Authority's hearing officers conducted a hearing and then filed an initial order concluding that the provider owned by the electric utility was not receiving a cross-subsidy in violation of Tenn. Code Ann. § 7-52-402 (2005). After the initial order became final, the private provider filed a Tenn. R. App. P. 12 petition for review with this court. We have concluded that the provider's uncompensated use of the electric utility's name is not a cross-subsidy prohibited by Tenn. Code Ann. § 7-52-402.

**Tenn. R. App. P. 12 Petition for Review; Judgment of the Tennessee Regulatory Authority Affirmed**

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which PATRICIA J. COTTRELL and FRANK G. CLEMENT, JR., JJ., joined.

Henry M. Walker and Kristy R. Godsey, Nashville, Tennessee, for the appellant, US LEC of Tennessee, Inc.

Carlos C. Smith and Mark W. Smith, Chattanooga, Tennessee, for the appellee, Electric Power Board of Chattanooga.

J. Richard Collier, Carolyn E. Reed, and Randall Gilliam, Nashville, Tennessee, for the appellee, Tennessee Regulatory Authority.

**OPINION**

**I.**

The Electric Power Board of Chattanooga (EPB) was created by private act in 1935.[1] It provides electric power to both business and residential customers in the City of Chattanooga, most of Hamilton County, and parts of eight other Tennessee counties and North Georgia. In October 1997, after the Tennessee General Assembly, following Congress's lead, authorized municipal electric utilities to begin offering telecommunications services,[2] EPB applied to the Tennessee Regulatory Authority (Authority) for a certificate of convenience and necessity to enable it to begin providing telecommunications services through a telecommunications division that would be separate from EPB's electric utility system.

Because EPB's application was the first of its kind in Tennessee, the Authority convened a contested case proceeding to consider its application for a certificate of convenience and necessity. Eight entities intervened in the proceeding, including the Consumer Advocate Division of the Office of the Attorney General and Reporter, BellSouth Telecommunications, Inc., AT&T Communications of the Southern States, Inc., and the Tennessee Cable Telecommunications Association (TCTA). US LEC of Tennessee, Inc. (US LEC), a North Carolina telecommunications services provider doing business in the Chattanooga market, did not intervene. From the outset, EPB made it clear that it intended to operate its telecommunications division under its own name, and the intervenors likewise made it clear that they were equally insistent that EPB's electric utility system should not cross-subsidize its telecommunications division.

The TCTA led the opposition to EPB's application for a certificate of convenience and necessity. One of TCTA's experts recognized that, unlike other new entrants into the local telecommunications services market, EPB had a "substantial amount of goodwill and name recognition developed with those electric ratepayers." To address TCTA's concerns about the cross-subsidization prohibited by Tenn. Code Ann. § 7-52-402, the TCTA and EPB negotiated and filed with the Authority a detailed set of conditions on EPB's certificate that were intended to ensure compliance with Tenn. Code Ann. § 7-52-402.[3]

By their own terms, these conditions formed "the essential methods that EPB should adopt to properly separate telecommunications from electric power accounting data, [to] provide assurance that cross-subsidization does not occur, and to properly allocate cost." The conditions recognized that EPB would provide telecommunications services through a discrete telecommunications services division, that the revenues and expenses of the telecommunications services division would

---

[1] Act of Apr. 15, 1935, ch. 455, 1935 Tenn. Priv. Acts 1125.

[2] Act of May 27, 1997, ch. 531, 1997 Tenn. Pub. Acts 963 (codified at Tenn. Code Ann. §§ 7-52-401, -407 (2005)).

[3] The Authority had requested the TCTA and EPB to confer about the issues raised regarding EPB's compliance with Tenn. Code Ann. § 7-52-402.

be segregated from those of the electric utility system, and that the two entities would acquire services from each other at the rates charged other customers. They also provided a "general allocator" for expenses that could not be directly allocated. With specific regard to joint marketing, the conditions included a Code of Conduct providing that:

> The electric system and the telecommunications division of the Electric Power Board of Chattanooga may jointly offer their respective products and services to customers provided that the customer is informed (a) of the separate identities of each and (b) that the products and services of the electric utility system are distinct and separately priced from the offerings of the telephone division and the customer may select one without the other.

On May 10, 1999, the Authority granted EPB a certificate of convenience and necessity, and "EPB Telecom" began providing telecommunications services to local businesses in April 2000.

On May 15, 2002, US LEC filed a complaint with the Authority alleging that EPB was engaging in discriminatory and anti-competitive business practices. It complained that EPB was allowing EPB Telecom to use EPB's name, that EPB was granting EPB Telecom access to buildings that it was not granting to other telecommunications providers, and that EPB had failed to file its annual audits with the Authority. BellSouth Telecommunications, Inc. intervened in the proceeding, and in June 2002, the Authority referred the matter to a hearing officer for disposition. Three months later, US LEC filed an amendment to its complaint containing a fourth allegation – that EPB Telecom had refused to allow US LEC to interconnect with EPB Telecom's network or to provide certain unbundled services.

The hearing officer later concluded that US LEC did not have standing to take issue with EPB Telecom's failure to file its annual audits, and the parties informally resolved US LEC's building access and network interconnection and unbundled services claims. Thus, the only remaining issue involved US LEC's claim that EPB's marketing and advertising activities violated the anti-subsidization provisions in Tenn. Code Ann. § 7-52-402 or the Code of Conduct agreed upon by EPB and the TCTA.

The hearing officer conducted hearings on February 25 and March 16, 2004. During these hearings, US LEC presented evidence that EPB's name was instantly recognizable and that it had value because of the company's reputation for quality and goodwill with its customers. It also presented evidence purporting to demonstrate that EPB was intentionally blurring the lines between its electric utility system and EPB Telecom. US LEC cited various sales tactics, joint marketing activities, press releases, and the EPB website as evidence of the manner in which EPB had allowed EPB Telecom to leverage EPB's name and insisted that these activities violated the Code of Conduct and Tenn. Code Ann. § 7-52-402. For its part, EPB insisted that its conduct was consistent with both the Code of Conduct and Tenn. Code Ann. § 7-52-402.

In its post-hearing brief, US LEC insisted that joint marketing provisions in the Code of Conduct should be clarified and strengthened. It argued that EPB Telecom should be required either to pay EPB for the use of its name or to operate using a name that did not indicate a relationship with EPB. Because of the difficulties in quantifying the benefit that EPB Telecom derives from its use of the EPB name, US LEC argued that requiring EPB Telecom to change its name would be more appropriate and that changing EPB Telecom's name would not pose an undue hardship on EPB Telecom because name changes are common in the telecommunications industry.

The hearing officer filed an initial order on May 6, 2004. Despite her conclusion that US LEC lacked standing to challenge EPB's advertising and marketing activities,[4] the hearing officer invoked the Authority's general supervisory and regulatory power under Tenn. Code Ann. § 65-4-104 (2004) as authority to address US LEC's complaints about EPB's and EPB Telecom's conduct. The hearing officer then concluded that EPB Telecom's uncompensated use of the EPB name was not a subsidy prohibited by Tenn. Code Ann. § 7-52-402 and that neither EPB nor EPB Telecom had violated the Code of Conduct. US LEC did not request the Authority to review the initial order, and so the initial order became the Authority's final order by operation of law on May 21, 2004. US LEC thereafter filed a Tenn. R. App. P. 12 petition for review on June 8, 2004.

## II.
### EPB'S ALLEGED VIOLATION OF TENN. CODE ANN. § 7-52-402

The outcome of this appeal hinges on the scope of Tenn. Code Ann. § 7-52-402's prohibition against a municipal electric system providing subsidies to its telecommunications services division. US LEC insists that EPB Telecom's uncompensated use of EPB's name is a subsidy prohibited by Tenn. Code Ann. § 7-52-402. The Authority and EPB respond that the subsidies prohibited by Tenn. Code Ann. § 7-52-402 are confined to the use of revenues from the sale of electricity to pay for costs of providing telecommunications services. These arguments require the court to focus first on the meaning of the word "subsidies" as it is used in Tenn. Code Ann. § 7-52-402.

### A.

The search of the meaning of statutory language is a judicial function. *Roseman v. Roseman*, 890 S.W.2d 27, 29 (Tenn. 1994); *BellSouth Telecomms., Inc. v. Greer*, 972 S.W.2d 663, 672 (Tenn. Ct. App. 1997). While the courts must carefully consider an administrative agency's interpretation of the statutes it is charged to enforce, *State ex rel. Pope v. U.S. Fire Ins. Co.*, 145 S.W.3d 529, 536 (Tenn. 2004); *Exxon Corp. v. Metropolitan Gov't*, 72 S.W.3d 638, 641 (Tenn. 2002), issues involving the construction of statutes involve questions of law. *Sallee v. Barrett*, 171 S.W.3d 822, 825 (Tenn. 2005); *Memphis Publ'g Co. v. Cherokee Children and Family Servs., Inc.*, 87 S.W.3d 67, 74 (Tenn. 2002). Accordingly, the courts must make their own independent determination regarding a statute's meaning without presuming that the agency's interpretation of the statute is

---

[4]The hearing officer concluded that US LEC lacked standing because it had failed to present any evidence that US LEC or any other telecommunications services provider had been adversely affected by EPB's or EPB Telecom's conduct.

correct. *Bostic v. Dalton*, 158 S.W.3d 347, 350 (Tenn. 2005); *Patterson v. Tenn. Dep't of Labor & Workforce Dev.*, 60 S.W.3d 60, 62 (Tenn. 2001).

When the courts are called upon to construe a state statute, their primary responsibility is to ascertain and give effect to the intent and purpose of the Tennessee General Assembly. *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 522 (Tenn. 2005); *Sullivan ex rel. Hightower v. Edwards Oil Co.*, 141 S.W.3d 544, 547 (Tenn. 2004). The courts must avoid constructions that unduly restrict or expand the statute's application. *Sallee v. Barrett*, 171 S.W.3d at 828; *Watt v. Lumbermens Mut. Cas. Ins. Co.*, 62 S.W.3d 123, 127-28 (Tenn. 2001). The goal is to construe a statute in a way that avoids conflict and facilitates the harmonious operation of the law. *In re C.K.G.*, 173 S.W.3d 714, 729 (Tenn. 2005); *Frye v. Blue Ridge Neuroscience Ctr., P.C.*, 70 S.W.3d 710, 716 (Tenn. 2002).

The search for a statute's purpose must begin with the words of the statute itself. *Calaway ex rel. Calaway v. Schucker*, ___ S.W.3d ___, ___, 2005 WL 3338655, at *5 (Tenn. 2006); *Biscan v. Brown*, 160 S.W.3d 462, 470 (Tenn. 2005). The courts must construe statutes as they find them. *Jackson v. Jackson*, 186 Tenn. 337, 342, 210 S.W.2d 332, 334 (1948); *Pac. Eastern Corp. v. Gulf Life Holding Co.*, 902 S.W.2d 946, 954 (Tenn. Ct. App. 1995). The courts must also presume that the General Assembly chose its words purposefully and deliberately, *Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004); *Merrimack Mut. Fire Ins. Co. v. Batts*, 59 S.W.3d 142, 151 (Tenn. Ct. App. 2001), and that the words chosen by the General Assembly convey the meaning that the General Assembly intended them to convey. *Biscan v. Brown*, 160 S.W.3d at 473; *Jones v. Garrett*, 92 S.W.3d 835, 839 (Tenn. 2002).

The courts must construe a statute's words using their natural and ordinary meaning unless the context in which the words are used requires otherwise. *Tenn. Waste Movers, Inc. v. Loudon*, 160 S.W.3d 517, 519 (Tenn. 2005); *Frazier v. East Tennessee Baptist Hosp., Inc.*, 55 S.W.3d 925, 928 (Tenn. 2001). Because words are known by the company they keep, *In re Audrey S.*, 182 S.W.3d 838, 870 (Tenn. Ct. App. 2005), the courts should construe statutory language in the context of the entire statute and it light of the statute's general purpose. *Honsa v. Tombigbee Transp. Corp.*, 141 S.W.3d 540, 542 (Tenn. 2004); *Osborn v. Marr*, 127 S.W.3d 737, 740 (Tenn. 2004). When the meaning of statutory language is clear, the courts must interpret the statute as written, *Kradel v. Piper Indus., Inc.*, 60 S.W.3d 744, 749 (Tenn. 2001), rather than using the rules of construction to give the statute another meaning. *Wausau Ins. Co. v. Dorsett*, 172 S.W.3d 538, 543 (Tenn. 2005); *Poper ex rel. Poper v. Rollins*, 90 S.W.3d 682, 684 (Tenn. 2002); *Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73, 83 (Tenn. 2001).

Statutes, however, are not always free from ambiguity. When the courts encounter ambiguous statutory language – language that can reasonably have more than one meaning[5] – they must look to the entire statute, the statutory scheme of which the statute is a part, and elsewhere to ascertain the General Assembly's intent and purpose. *Sallee v. Barrett*, 171 S.W.3d at 828; *Eastman*

_____

[5]*LeTellier v. LeTellier*, 40 S.W.3d 490, 498 (Tenn. 2001); *Bryant v. HCA Health Servs. of N. Tenn., Inc.*, 15 S.W.3d 804, 809 (Tenn. 2000).

*Chem. Co. v. Johnson*, 151 S.W.3d at 507; *Perrin v. Gaylord Entm't Co.*, 120 S.W.3d 823, 826 (Tenn. 2003). The courts frequently find interpretive guidance in a statute's legislative history. *State ex rel. Pope v. U.S. Fire Ins. Co.*, 145 S.W.3d at 535; *Galloway v. Liberty Mut. Ins. Co.*, 137 S.W.3d 568, 570 (Tenn. 2004). The courts must, however, be cautious when they consult a statute's legislative history. *BellSouth Telecomms., Inc. v. Greer*, 972 S.W.2d at 673. A statute's meaning must be grounded in its text. Thus, comments made during the General Assembly's debates cannot justify a construction of a statute that has no reference points in the text of the statute itself. *D. Canale & Co. v. Celauro*, 765 S.W.2d 736, 738 (Tenn. 1989); *Townes v. Sunbeam Oster Co.*, 50 S.W.3d 446, 453 n.6 (Tenn. Ct. App. 2001). When a statute's text and the comments made by legislators during the debates on the statute diverge, the text controls. *BellSouth Telecomms., Inc. v. Greer*, 972 S.W.2d at 674.

**B.**

Our task in this case is not limited to picking the most appropriate dictionary definition of the word "subsidies." Rather, it is to ascertain the General Assembly's purpose for enacting Tenn. Code Ann. § 7-52-402. While consulting a dictionary may be a helpful place to identify the possible meanings of a word or phrase, it is only the beginning of the search for legislative intent, not the end. Statutes should not be construed as if they are simply a series of Webster's definitions strung together. *See* LIEF H. CARTER & THOMAS F. BURKE, REASON IN LAW (6th ed. 2002). Once the possible meanings of a word or phrase have been identified, the courts should then narrow the possibilities by considering the context in which the word or phrase is used, the underlying facts, the legislative history, and prior decisions. REED DICKERSON, THE INTERPRETATION AND APPLICATION OF STATUTES 103 & n.2, 105 (1975); Samuel A. Thumma & Jeffrey L. Kirchmeier, *The Lexicon Has Become a Fortress: The United States Supreme Court's Use of Dictionaries*, 47 Buff. L. Rev. 227, 296 (1999).

In its most general sense, the word "subsidy" refers to "a grant or gift of money or other property made by way of financial aid."[6] It is also commonly understood as a "grant usually made by the government, to any enterprise whose promotion is considered to be in the public interest."[7] In the context of regulated industries, a "subsidy" is a payment by the government or other entity to a producer in order to induce the producer to provide services otherwise thought to be unprofitable. Gerald R. Faulhaber, *Cross-Subsidy Analysis With More Than Two Services*, 1 J. Competition L. & Econ. 441, 442 (2005) ("Faulhaber").

With regard to the regulated services, a subsidy involves an external flow of cash from an outside source. Faulhaber, 1 J. Competition L. & Econ., at 442. The internal flow of cash from one division of an enterprise to another is referred to as a "cross-subsidy." Faulhaber, 1 J. Competition L. & Econ., at 442. A cross-subsidy occurs when an enterprise uses the revenues from the sale of one service to offset its cost to produce and sell another service. *See Alliant Energy Corp. v. Bie*,

---

[6]WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2279 (1971).

[7]BLACK'S LAW DICTIONARY 1469 (8th ed. 2004); *see also* XVII THE OXFORD ENGLISH DICTIONARY 60 (1989).

330 F.3d 904, 917 (7th Cir. 2003); *see also In re Implementation of the Telecommunications Act of 1996: Accounting Safeguards Under the Telecommunications Act of 1996*, 11 F.C.C.R. 17539, 17542 n.4 (1996).

Cross-subsidies are not commonplace in unregulated markets. They are not profit maximizing, and thus enterprises providing unregulated services have little incentive to cross-subsidize.[8] However, incentives to cross-subsidize arise when an enterprise provides services in both regulated and unregulated markets. In that circumstance, the enterprise may seek to lower the price of the service in the unregulated market by allocating a portion of its costs of providing the service to its costs of providing the regulated service. *GTE Midwest, Inc. v. F.C.C.*, 233 F.3d 341, 344 n.1 (6th Cir. 2000) (defining cross-subsidization as "the misattribution of costs incurred in providing unregulated services to the provision of regulated services"); *California v. F.C.C.*, 39 F.3d 919, 926 (9th Cir. 1994); *Ameritech Corp. v. United States*, 867 F. Supp. 721, 726 (N.D. Ill. 1994); *Florida Cable Television Ass'n v. Deason*, 635 So. 2d 14, 15 n.2 (Fla. 1994).

The use of revenues from the sale of services in a regulated market to subsidize the cost of providing the services in the unregulated market is a cross-subsidy. The practice is anti-competitive and produces two negative effects. First, it results in the enterprise's customers in the regulated market being overcharged for their services because they are paying the cost of the subsidy of the unregulated service. Second, the enterprise engaging in cross-subsidization gains an unfair competitive advantage in the unregulated market because the cross-subsidy enables the enterprise to provide the unregulated service below its actual cost. *In re Complaint of MCTA*, 615 N.W.2d 255, 266 (Mich. Ct. App. 2000).

The legislators' discussions both in committee and during floor debate regarding Tenn. Code Ann. § 7-52-402 reveal that cross-subsidization was their chief concern with regard to permitting municipal electric utilities to begin providing local telecommunications services in competition with privately owned providers. The bill's supporters emphasized that competition in the local telecommunications market was important and that electric utilities providing telecommunications services would not be permitted to use "rate dollars" to subsidize their telecommunications business. Accordingly, we have concluded that the purpose of Tenn. Code Ann. § 7-52-402 is to prevent municipal electric utilities who decide to provide telecommunications services from shifting the costs of providing telecommunications services to their electricity customers.

---

[8]As Professor Faulhaber explains:

> Under competitive conditions, the issue of cross-subsidy simply does not arise. Firms with constant returns to scale technology compete in markets so that price is driven to marginal cost which covers total cost. Every product pays its own way; if it did not, there would be profitable opportunities for entry and repricing. Customers of any product or service who faced prices that forced them to pay too much . . . would soon find competitors willing to offer equivalent service at lower prices. The competitive market would police cross-subsidy, without need of a regulator.

Faulhaber, 1 J. Competition L. & Econ., at 442.

This record contains no evidence to support a conclusion that the uncompensated use of EPB's name is a subsidy prohibited by Tenn. Code Ann. § 7-52-402. EPB established its reputation long before EPB Telecom began providing telecommunications services. When EPB Telecom began operating, it was required to establish its own identity in the local telecommunications services market, and the record contains no evidence that EPB's electricity customers have paid for any of these promotional costs. To the contrary, the record contains substantial and material evidence supporting the hearing officer's conclusion that EPB Telecom has used its own revenues to pay these costs. Accordingly, we concur with the hearing officer's conclusion that US LEC failed to prove that EPB Telecom's use of EPB's name violates Tenn. Code Ann. § 7-52-402.

## III.
### EPB's ALLEGED VIOLATION OF THE CODE OF CONDUCT

US LEC also insists that EPB's and EPB Telecom's joint marketing activities go beyond the scope of activities permitted by the Code of Conduct that was part of EPB's 1999 certificate of convenience and necessity. It also asserts that the Code of Conduct did not go far enough in protecting EPB Telecom's competitors against marketing practices that would give EPB Telecom an unfair advantage in the telecommunications services marketplace. We find no basis for these claims.

When EPB applied for a certificate of convenience and necessity to provide telecommunications services, its future competitors were well aware of the dangers of cross-subsidization. Accordingly, the Authority directed EPB and the other providers of telecommunications services in the Chattanooga market to negotiate a set of conditions that would ensure compliance with Tenn. Code Ann. § 7-52-402. These conditions contained specific accounting requirements that would enable the Authority and EPB's competitors to track EPB Telecom's revenues and costs, as well as specific requirements for the relationship between EPB and EPB Telecom. They permitted joint marketing of regulated and unregulated services as along as EPB and EPB Telecom maintained their separate identities and refrained from bundling their services.

US LEC presented a substantial amount of evidence regarding the joint marketing activities of EPB and EPB Telecom. This evidence included sales brochures, press releases, the EPB website, and a booth at a Chattanooga business fair. All this evidence reveals that EPB and EPB Telecom continue to maintain their separate identities and are refraining from bundling their services. There is likewise no evidence that EPB Telecom has not paid its share of the costs of these activities or that EPB's electricity customers are paying for any of the costs that are properly attributable to EPB Telecom. Thus, we agree with the hearing officer's conclusion that US LEC failed to prove that EPB has violated the conditions of its certificate of convenience and necessity designed to prevent cross-subsidization.

As a final matter, US LEC insists that the conditions on EPB's certificate of convenience and necessity do not go far enough to protect EPB Telecom's competitors from unfair or anti-competitive practices. It argues that the only feasible way to protect competition in the Chattanooga

telecommunications services market is to require EPB Telecom to discontinue using EPB's name. We have determined that the hearing officer correctly concluded that this proposed remedy was far more drastic than the attenuated competitive impact of EPB Telecom's use of EPB's name may have on the telecommunications services market in Chattanooga.

EPB was the only entity permitted to apply for the certificate of convenience and necessity under Tenn. Code Ann. § 7-52-401. From the outset, it was clear that EPB intended to provide telecommunications services through a separate but wholly-owned division. The Authority granted the certificate of convenience and necessity to provide telecommunications services to EPB. Thus, EPB's decision to name its telecommunications division "EPB Telecom" is entirely truthful and reflects the reality that EPB Telecom is part of EPB. US LEC failed to produce any evidence that the use of the name "EPB Telecom" has had any measurable anti-competitive effect in the marketplace for telecommunications services in the Chattanooga area. Without this evidence, and because of the potential adverse effect of depriving consumers of truthful information regarding EPB Telecom's affiliation,[9] we conclude that the record lacks any factual basis that would have required the Authority to order EPB Telecom to discontinue the use of EPB's name.

## IV.

We affirm the Authority's order concluding that EPB Telecom's uncompensated use of EPB's name does not violate Tenn. Code Ann. § 7-52-402 and denying all of US LEC's requests for relief. The case is remanded to the Tennessee Regulatory Authority for whatever further proceedings may be required, and the costs of this appeal are taxed to US LEC of Tennessee, Inc. for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., P.J., M.S.

---

[9] EPB introduced two articles concluding that name and logo restrictions such as the one suggested by US LEC in this case could harm consumers by depriving them of truthful information regarding with whom they are dealing. Charles J. Ogletree, Jr., et al., *Utility Affiliates: Why Restrict Use of Names and Logos?*, Pub. Util. Fort., July 15, 1999, at 34; Kenneth Gordon & Charles Augustine, *Fostering Efficient Competition in the Retail Electric Industry: How Can Regulators Help Solve Vertical Market Power Concerns? First, Do No Harm* 20-23 (Edison Elec. Inst. Aug. 1998).